1
2025 CO 42 The People of the State of Colorado, Plaintiff-Appellee v. Robert Keith Ray. Defendant-Appellant No. 10SA157Supreme Court of Colorado, En BancJune 23, 2025

ADVANCE
SHEET HEADNOTE

In this
direct appeal, the defendant asserts that the district court
erred by admitting uncharged misconduct evidence as res
gestae, witness- and victim-fear evidence, victim-impact
evidence during the guilt phase of trial, and positive
evidence of the homicide victims' characters. He also
asserts that the prosecution engaged in numerous instances of
misconduct, which violated his right to a fair trial. He
further contends the district court erred by denying his
request to subpoena jurors to investigate allegations of
juror misconduct during deliberations. And finally, the
defendant challenges his sentence -a term of life

without the possibility of parole, which was imposed after
the Governor commuted his originally imposed death
sentence-as unconstitutional under the Eighth Amendment.

The
supreme court concludes that although the district court
erred in some ways, none of those errors, individually or
cumulatively, warrant reversal. Similarly, although some of
the prosecution's comments were improper, none of them
constitutes reversible misconduct. The supreme court further
concludes that the district court properly denied inquiry
into alleged juror misconduct under CRE 606(b). And lastly,
the court holds that the defendant's sentence is
constitutional.

The
supreme court therefore affirms the judgment of conviction
and commuted sentence.

Appeal
from the District Court Arapahoe County District Court Case
No. 06CR697 Honorable Gerald J. Rafferty, Judge

Attorneys for Plaintiff-Appellee: Philip J. Weiser, Attorney
General Katharine Gillespie, Senior Assistant Attorney
General Carmen Moraleda, Senior Assistant Attorney General
Denver, Colorado

Attorneys for Defendant-Appellant: Elisabeth Hunt White
Boulder, Colorado

Johnson &Klein, PLLC Gail K. Johnson Eric K. Klein
Boulder, Colorado

CHIEF
JUSTICE MÁRQUEZ, JUSTICE BOATRIGHT, JUSTICE GABRIEL,
JUSTICE HART, and JUSTICE BERKENKOTTER joined.

JUSTICE SAMOUR did not participate.

OPINION

HOOD,
JUSTICE

¶1
Javad Marshall-Fields and his fiancee, Vivian Wolfe, were
killed in a drive-by shooting ("the Dayton Street
shooting"), just eight days before Marshall-Fields was
expected to testify against Robert Keith Ray. Marshall-Fields
had identified Ray as one of two gunmen in another shooting
at Lowry Park the year before ("the Lowry Park
shooting").

¶2
Ray was eventually charged with numerous offenses related to
the Dayton Street shooting, and a jury found him guilty of
nearly all of them. The district court entered the judgment
of conviction, and following a separate sentencing trial,
sentenced Ray to death. Pursuant to the unitary review
process then in effect, Ray appealed his convictions and
sentences related to the Dayton Street shooting directly to
this court. See §§ 16-12-201 to -210,
C.R.S. (2024); Crim. P. 32.2. This opinion addresses that
appeal.

¶3
The Colorado General Assembly subsequently abolished the
death penalty, and in March 2020, Governor Jared Polis
commuted Ray's capital sentence to a sentence of life
without the possibility of parole ("LWOP").
Although we determined that the unitary review process no
longer applied in this case, we chose to retain jurisdiction
over the appeal. And, having reviewed Ray's challenges to
his convictions and LWOP sentence, we now affirm.

I.
Facts and Procedural History

¶4
Ray was charged with twenty-one counts related to the Dayton
Street shooting, which included two counts of first degree
murder for the deliberate killing of Marshall-Fields and
Wolfe.[1] The prosecution's theory of the case
was that Ray had conspired with others to prevent witnesses
of the Lowry Park shooting from testifying in that trial, and
that conspiracy culminated in the murders of Marshall-Fields
and Wolfe. To understand the full context of Ray's trial
for the Dayton Street shooting, we must therefore begin with
the Lowry Park shooting.

A.
The Lowry Park Shooting

¶5
On July 4, 2004, Marshall-Fields and Gregory Vann hosted a
barbecue and rap battle at Lowry Park. The event was well
attended, and a large crowd gathered at the park throughout
the afternoon and evening. As the event wound down,
Marshall-Fields and Vann noticed an altercation in a parking
lot adjacent to the

park and went over to investigate. During the ensuing
confrontation, Ray's friend, Sir Mario Owens, shot and
killed Vann, and Ray shot Marshall-Fields and Vann's
brother, Elvin Bell. Ray and Owens then fled in Ray's
Suburban.

¶6
Ray and Owens sought to conceal their involvement in these
shootings. With the help of Ray's wife, LaToya Sailor Ray
("Sailor"), and others, Ray and Owens disposed of
certain evidence that might have connected them to the
shootings (e.g., the Suburban, guns, and clothes). Owens also
cut off his braids to change his appearance after he learned
that a witness had described Vann's shooter as having
braids. The two men spent the next several days in hiding.

¶7
Meanwhile, the police attempted to identify the Lowry Park
shooters. With the help of several witnesses, the police soon
identified Ray as the driver of the Suburban and arrested him
as an accessory to the Lowry Park shooting. While awaiting
his trial on bond, Ray reviewed a discovery packet with Owens
and Sailor. From this discovery packet, they learned that two
witnesses-Marshall-Fields and Askari Martin-had identified
Ray as the getaway driver from the Lowry Park shooting. There
was nothing in the packet to indicate that the police had
identified the individual who shot Vann. Ray, Owens, and
Sailor then began referring to Marshall-Fields and Martin as
"snitches" and made comments to the effect that
"snitches do not live long" and "snitches
die."

¶8
Around this same time, Ray told his friend Jamar Johnson to
offer $10,000 to both Marshall-Fields and Martin in exchange
for them not testifying. Ray also told Johnson that if the
bribes didn't work, he'd pay Johnson $10,000 to kill
them both. A few months later, Ray again offered Johnson
$10,000 to bribe or kill just Marshall-Fields because by
then, Martin had approached Ray and told him he didn't
want to "snitch" and that, although the prosecution
was trying to force him, he wasn't going to testify. Ray
also told Sailor he wasn't worried about Martin
testifying anymore. Ray continued to worry, however, about
Marshall-Fields's testimony, which would make him a
shooter and place him behind the wheel of the Suburban at the
Lowry Park shooting.

¶9
On June 19, 2005-eight days before Ray's Lowry Park
trial-Sailor went to a Father's Day barbecue at a park.
Ray called and asked if she'd seen MarshallFields at the
park. She said she had, and Ray and Johnson arrived soon
after. They saw Marshall-Fields and watched him leave the
park. Ray told Johnson that Marshall-Fields was still
planning to testify and that he would "take things into
[his] own hands."

¶10
Later that same day, Ray and Owens were out with their
friends, Parish Carter and Checados Todd, when they saw
Marshall-Fields's car at Gibby's, a local sports bar.
Carter went into the bar and told Marshall-Fields,
"They're looking for

you in the street, homie." The next day, June 20, 2005,
Marshall-Fields and Wolfe were killed in a drive-by shooting
on Dayton Street in Aurora.

¶11
Despite the Dayton Street double murder, Ray's Lowry Park
trial proceeded as scheduled. In November 2006, the jury
acquitted Ray of Vann's murder and the attempted murder
of Jeremy Green (another bystander at the Lowry Park
shooting), but it convicted him of attempted first degree
murder and first degree assault of Bell and Marshall-Fields,
and as an accessory to Vann's first degree murder. The
court sentenced Ray to 108 years imprisonment for his Lowry
Park crimes.

¶12
After the Dayton Street shooting, witnesses finally
identified Owens as the person who had shot and killed Vann
at Lowry Park. As a result, Owens was charged and ultimately
convicted of numerous offenses related to the Lowry Park
shooting, including Vann's murder.

B.
The Dayton Street Shooting

¶13
Meanwhile, the investigation of the Dayton Street shooting
was underway. Police officers had identified Owens as the
Dayton Street shooter. Ray, however, had an alibi for that
shooting: He stopped by a barbecue Sailor was hosting at her
house and then went with her neighbor to a liquor store.
Still, a grand jury indicted both Ray and Owens for the
Dayton Street shooting. The men were tried separately.

¶14
At Ray's trial, the prosecution's theory of the case
was that, after Ray's attempts to intimidate and bribe
Marshall-Fields to prevent him from testifying in the Lowry
Park trial failed, Ray conspired with Owens and Carter to
kill MarshallFields. The prosecution argued that Ray wanted
to avoid going to prison for the Lowry Park shooting because
he was running a lucrative illegal drug business that he
didn't want to lose.

¶15
After lengthy trial proceedings related to the Dayton Street
shooting, a jury convicted Ray of all charges except for
three witness intimidation counts. The jury then found that a
capital sentence was appropriate for Ray's role in
MarshallFields's murder. The district court sentenced Ray
to consecutive sentences of (1) death for murdering
Marshall-Fields, (2) LWOP for murdering Wolfe, and (3) an
aggregate 155 years in prison on the remaining counts.

II.
Analysis

¶16
Ray now appeals his Dayton Street convictions and the
resulting LWOP sentence to this court. He contends that the
trial court made numerous evidentiary errors, including
admitting a large amount of uncharged misconduct evidence
under the now-defunct res gestae doctrine. He also challenges
the court's admission of, among other things, witness-
and victim-fear evidence, victimimpact evidence, and positive
evidence of Marshall-Fields's and Wolfe's character.
Ray further alleges that the prosecution improperly appealed
to the jurors'

sympathies and biases, improperly referenced the grand jury
indictment, and undermined the presumption of innocence. He
argues that these errors, either in isolation or
cumulatively, warrant reversal. Although we agree with Ray
that the trial court made several evidentiary errors, we
ultimately conclude that they don't warrant reversal.

¶17
We also reject Ray's contention that the district court
erred by refusing to allow Ray to subpoena jurors to testify
about alleged juror misconduct during deliberations. Finally,
we reject Ray's claim that his LWOP sentence is
unconstitutional.

¶18
We address each of Ray's contentions in turn, discussing
additional procedural or background facts as needed.

A.
Evidentiary Issues

¶19
We start by briefly identifying the applicable standards of
review and general relevancy principles. Trial courts have
broad discretion to determine the admissibility of evidence,
and we review those rulings for an abuse of discretion.
Davis v. People, 2013 CO 57, ¶ 13, 310 P.3d 58,
61-62. A court abuses its discretion if its decision is
manifestly arbitrary, unreasonable, or unfair, or if it
misapplies the law. People v. Montoya, 2024 CO 20,
¶ 47, 546 P.3d 605, 616.

¶20
When an error is preserved by a contemporaneous objection, we
generally consider whether the error warrants reversal under
a harmless error standard. Id.

An error is harmless if it doesn't substantially
influence the jury's verdict or affect the fairness of
the trial proceedings. Id.; see also Crim.
P. 52(a). To analyze such harm, we may consider "factors
like evidentiary cross-admissibility, the appropriateness of
jury instructions, and whether there is any indication that
the jury blended the issues in considering their
verdict." Washington v. People, 2024 CO 26,
¶ 23, 547 P.3d 1087, 1092. If the error is unpreserved,
however, we review for plain error. Hagos v. People,
2012 CO 63, ¶ 14, 288 P.3d 116, 120; see also
Crim. P. 52(b). Under this standard, we will reverse only if
the error is obvious, substantial, and so undermined the
trial's fundamental fairness as to cast serious doubt on
the reliability of the conviction. Hagos, ¶ 14,
288 P.3d at 120.

¶21
Generally, all relevant evidence is admissible. CRE 402.
"'Relevant evidence' means evidence having any
tendency to make the existence of any fact that is of
consequence to the determination of the action more probable
or less probable than it would be without the evidence."
CRE 401. However, even relevant evidence may be excluded if
the risk of unfair prejudice substantially outweighs its
probative value. CRE 403.

¶22
With these standards and rules in mind, we unpack the law
governing the admission of uncharged misconduct evidence and
apply it to Ray's contentions of error.

1.
Uncharged Misconduct Evidence

¶23
On appeal, Ray asserts that the trial court erred by
admitting "significant" evidence of uncharged
misconduct. He specifically challenges the court's
admission of evidence related to (1) the Lowry Park shooting;
(2) threats Ray allegedly made against Brandi Taylor (his
brother's girlfriend) and Askari Martin (one of the Lowry
Park witnesses who had identified Ray as the getaway driver);
(3) an altercation with Sailor in which she suffered a black
eye; (4) threats Ray allegedly made against Lowry Park
witness Teresa Riley's son; and (5) Ray's alleged
drug dealing before 2005. (The drug offenses charged in the
current case allegedly occurred between January and June
2005.)

¶24
The trial court found that the Lowry Park evidence was
admissible as res gestae but ruled that any such evidence
admitted at trial must be accompanied by a limiting
instruction.[2] The court also found that evidence of the
threats against Martin and Taylor[3] and the incident involving
Sailor's black eye was admissible as res gestae.

¶25
The trial court admitted evidence related to the threats
against Riley's son as impeachment evidence. And lastly,
the court admitted evidence related to Ray's alleged drug
dealing before 2005 under CRE 404(b).

a.
Res Gestae Evidence

¶26
To understand the common law res gestae doctrine, it helps to
first examine the modern rule governing the admissibility of
uncharged misconduct evidence: CRE 404(b). Rule 404(b)(1)
provides that evidence of other crimes, wrongs, or acts
isn't "admissible to prove a person's character
in order to show that on a particular occasion the person
acted in conformity with the character." But this
evidence may be admissible if offered for another purpose,
"such as proving motive, opportunity, intent,
preparation, plan, knowledge, identity, absence of mistake,
or lack of accident." CRE 404(b)(2). The prosecution
must provide pretrial written notice of its intent to
introduce such evidence, specifying "the permitted
purpose for which the prosecution intends to offer the
evidence and the reasons supporting that purpose."
People v. Owens, 2024 CO 10, ¶ 111, 544 P.3d
1202, 1227; see also CRE 404(b)(3). The court then
determines whether the evidence is admissible by applying the
four-prong test outlined in People v. Spoto, 795
P.2d 1314, 1318-19 (Colo. 1990).

If the court determines the uncharged misconduct evidence is
admissible, and if requested by the defendant, the court must
"contemporaneously instruct the jurors of the limited
purpose for which the evidence may be considered."
Rojas v. People, 2022 CO 8, ¶ 27, 504 P.3d 296,
305; see also CRE 105.

¶27
At the time of Ray's trial, Colorado also embraced the
longstanding res gestae doctrine as an alternate theory of
admissibility for uncharged misconduct evidence. Under this
doctrine, such evidence was admissible without adhering to
Rule 404(b)'s strictures if the evidence was
"incidental to a main fact and explanatory of it,
including acts and words which are so closely connected
therewith as to constitute a part of it, and without a
knowledge of which the main fact might not be properly
understood." Rojas, ¶ 18, 504 P.3d at 302
(quoting Denver City Tramway Co. v. Brumley, 116 P.
1051, 1052 (Colo. 1911)).

¶28
While Ray's appeal was pending, we abolished the res
gestae doctrine. Id. at ¶¶ 1-4, 504 P.3d
at 300-01. In Rojas, we concluded that this
amorphous and unpredictable doctrine had become "a
breeding ground for confusion, inconsistency, and
unfairness." ¶ 3, 504 P.3d at 301. The Colorado
Rules of Evidence, we reasoned, suffice to evaluate the
admissibility of uncharged misconduct evidence. Id.
at ¶¶ 39-41, 504 P.3d at 307. While we can't
fault the trial court for failing to foresee this
development, "we generally apply the law in

effect at the time of appeal," and so we must conclude
that the trial court abused its discretion by admitting any
evidence under this now-abolished doctrine. Owens,
¶ 112, 544 P.3d at 1228.

¶29
But just because the uncharged misconduct evidence wasn't
admissible as res gestae doesn't mean it wasn't
admissible at all. And even if some of this evidence was
inadmissible, the court's error in admitting it may have
been harmless. We must consider both possibilities in
deciding whether the trial court's admission of res
gestae evidence justifies reversal. See People v.
Eppens, 979 P.2d 14, 22 (Colo. 1999) (explaining that an
appellate court may affirm "on any ground supported by
the record, regardless of whether that ground was relied upon
or even contemplated by the trial court").

¶30
So, we begin by considering whether Rule 404(b) could have
provided an alternative basis for admission. In
Rojas, we explained that, when "evaluating
whether uncharged misconduct evidence triggers Rule 404(b), a
trial court must first determine if the evidence is intrinsic
or extrinsic to the charged offense." ¶ 52, 504
P.3d at 309. Intrinsic acts are limited to "(1) those
that directly prove the charged offense and (2) those that
occur contemporaneously with the charged offense and
facilitate the commission of it." Id. at ¶
44, 504 P.3d at 308. All other acts are extrinsic.

¶31
Evidence of intrinsic acts is exempt from Rule 404(b)-because
it is essentially evidence of charged misconduct-and
courts should consider its admissibility under the general
rules of relevance and prejudice. Id. at ¶ 52,
504 P.3d at 309; see also CRE 401-403. The same goes
for evidence of extrinsic acts that don't suggest the
defendant's bad character. Rojas, ¶ 52, 504
P.3d at 309. If, however, the extrinsic-acts evidence
suggests that the defendant has a bad character and that he
acted in conformity with that bad character in this instance,
it is admissible "only as provided by Rule 404(b) and
after a Spoto analysis." Id.

¶32
Under Spoto, courts must consider whether the
evidence (1) relates to a material fact and (2) is logically
relevant (3) independent of the prohibited inference that the
defendant has a bad character and acted in conformity with
that character in this instance, and (4) whether the risk of
unfair prejudice substantially outweighs the evidence's
probative value. 795 P.2d at 1318-19; see also
Owens, ¶ 110, 544 P.3d at 1227.

¶33
A material fact is one "that is of consequence to the
determination of the action." Fletcher v.
People, 179 P.3d 969, 974 (Colo. 2007) (quoting CRE
401). Material facts include both (1) "ultimate
facts," such as the elements of the offense, and (2)
"intermediate facts," meaning facts that are
probative of ultimate facts. Yusem v. People, 210
P.3d 458, 464 (Colo. 2009); accord People v. Rath,
44 P.3d 1033, 1040 (Colo. 2002). In considering whether
uncharged misconduct evidence is

relevant to a material fact, we consider "not the
substance of the prior act evidence, but the fact in the case
for which the evidence is offered to prove."
Yusem, 210 P.3d at 464.

¶34
Once the court has identified a material fact, it must
determine if the uncharged misconduct evidence is logically
relevant to that fact. In other words, does the uncharged
misconduct evidence have some tendency to make the existence
of that material fact more or less probable than it would be
without the evidence? See Owens, ¶ 110, 544
P.3d at 1227. If the answer is yes, the court continues to
Spoto's third prong.

¶35
"The third prong of the Spoto test does not
demand the absence of the [prohibited] inference but merely
requires that the proffered evidence be logically relevant
independent of that inference." People v.
Snyder, 874 P.2d 1076, 1080 (Colo. 1994) (emphasis
added); see also Rath, 44 P.3d at 1038 ("[T]he
evidence must be probative for some logical reason other than
'that the defendant committed the crime charged because
of the likelihood that he acted in conformity with his bad
character.'" (quoting Spoto, 795 P.2d at
1318)). In other words, "the evidence cannot be relevant
only to show a propensity to commit crimes."
People v. Cross, 2023 COA 24, ¶ 21, 531 P.3d
444, 449 (quoting People v. Denhartog, 2019 COA 23,
¶ 42, 452 P.3d 148, 157).

¶36
In considering Spoto's fourth prong,
"[u]nfair prejudice occurs . . . if otherwise admissible
evidence has 'an undue tendency to suggest a decision
[made] on an improper basis,' which is 'commonly but
not necessarily an emotional one, such as sympathy, hatred,
contempt, retribution, or horror.'" People v.
Cousins, 181 P.3d 365, 370 (Colo.App. 2007) (second
alteration in original) (quoting People v. Dist.
Ct., 785 P.2d 141, 147 (Colo. 1990)). On appeal, we
"must afford the evidence the maximum probative value
attributable by a reasonable fact finder and the minimum
unfair prejudice to be reasonably expected."
Nicholls v. People, 2017 CO 71, ¶ 56, 396 P.3d
675, 687.

¶37
We now apply these principles to the trial court's
rulings.

i.
Lowry Park Evidence

¶38
Ray preserved his objection to the admission of the Lowry
Park evidence through pretrial motions and hearings. Thus, we
review the trial court's erroneous admission of this
evidence as res gestae for harmless error. In doing so, we
consider whether the Lowry Park evidence would have been
admissible under Rule 404(b). Thus, we begin with
Rojas's threshold intrinsic-extrinsic inquiry
and then turn to Spoto's four-part test as
necessary to evaluate extrinsic evidence.

¶39
As we observed in Owens, "[t]he Lowry Park
shootings did not directly prove, nor did they occur
contemporaneously with, the Dayton Street shooting[],"
so the Lowry Park evidence was extrinsic to the Dayton Street
charges. ¶ 115, 544 P.3d at 1228;

see also Rojas, ¶ 52, 504 P.3d at 309. And
because the Lowry Park evidence could impermissibly suggest
that Ray had a bad character and acted in conformity with
that character in this instance (i.e., he shot someone
before, so he likely orchestrated the Dayton Street
shooting), Rule 404(b) and Spoto applied. See
Rojas, ¶ 52, 504 P.3d at 309.

¶40
So, we must consider whether the Lowry Park evidence related
to a material fact in the Dayton Street case. The prosecution
argued that this evidence was relevant "to establish the
identities and roles of Ray and Owens in the [Dayton Street]
shooting as well as their guilty knowledge and [to] form the
basis of their motive to kill Marshall-Fields," and it
was therefore admissible to show that "[w]hat would
otherwise seem like a completely random drive-by shooting
actually has a context where Mr. Owens has a relationship
with Mr. Javad Marshall-Fields because of the July 4
murder of Gregory Vann." (Emphasis added.) ¶41
"'[M]otive is always relevant' to establish
whether the defendant committed the charged act and why, and
may also explain otherwise unexplainable behavior."
People v. Delsordo, 2014 COA 174, ¶ 14, 411
P.3d 864, 867 (quoting Wagman v. Knorr, 195 P. 1034,
1035 (Colo. 1921)). And Rule 404(b) expressly provides that
uncharged misconduct evidence may be admissible to prove
motive. Thus, because the Lowry Park evidence was relevant to
show motive for the Dayton Street shooting, it was logically
relevant to a material fact. See id. at ¶ 17,
411 P.3d at 868

(recognizing that uncharged misconduct evidence may be
relevant if it tends to show that the defendant committed a
second crime to avoid capture for the initial crime).

¶42
This logical relevance was also independent of any prohibited
propensity inference. The prohibited inference was that,
because Ray had been involved in at least attempting to kill
people before, he was probably involved this time too. But
the Lowry Park evidence's relevance was independent of
that inference because it showed how the Lowry Park and
Dayton Street shootings were connected and explained how the
first incident provided the motive for the second. See
Rath, 44 P.3d at 1040 (explaining that motive, while not
itself an ultimate fact, is among the "well-accepted
methods of proving the ultimate facts necessary to establish
the commission of a crime, without reliance upon an
impermissible inference from bad character").

¶43
Lastly, we must balance the probative value of the Lowry Park
evidence against any unfair prejudice it could have
introduced. This is the trickiest step on these facts.
There's no doubt that the Lowry Park evidence was highly
probative. It established a motive for the Dayton Street
shooting and connected Ray to Dayton Street when there would
otherwise have been no logical connection. But it also
carried a substantial risk that the jurors would confuse the
issues and unfairly assess Ray's guilt based on the
forbidden propensity inference (i.e., he's a

violent man who commits violent crimes) or by conflating the
strength of the direct evidence from the Lowry Park shooting
with the more circumstantial evidence from the Dayton Street
shooting.

¶44
This final step of the Spoto analysis as to the
Lowry Park evidence is further complicated by the sheer
volume of evidence the trial court admitted. That evidence
included about two weeks of testimony by dozens of witnesses,
disturbing photographs and videos, and numerous 911 calls.
The deluge of Lowry Park evidence heightened the potential
for the jury to simply infer that Ray was a violent person
with the propensity to commit violent crimes, rather than
focus on the evidence intrinsic to the Dayton Street
shooting. The evidence from the Lowry Park shooting that was
necessary to establish Ray's motive for the Dayton Street
shooting could have been introduced in perhaps two days,
rather than through a multitude of witnesses over two weeks
(of a four-week trial).

¶45
Nonetheless, even though we might have made a different
decision than the trial court about how much evidence from
the Lowry Park shooting to admit under Rule 404(b), we
conclude that any evidence improperly admitted didn't
substantially influence the jury's verdict or render the
trial unfair. See Owens, ¶ 117, 544 P.3d at
1228-29; see also Zapata v. People, 2018 CO 82,
¶ 67, 428 P.3d 517, 531.

¶46
We reach this conclusion for several reasons. First,
Ray received ample notice and an opportunity to be heard on
this issue. Before trial, the parties extensively debated the
admissibility of the Lowry Park evidence, and at trial, Ray
was able to cross-examine all the relevant witnesses and to
record objections in front of the jury.

¶47
Second, the court read a limiting instruction to the
jurors each time Lowry Park evidence was discussed or
admitted, informing them that the evidence was "offered
for the purpose of establishing background, motive,
relationship between individuals and identification of the
Defendant" and reminding them that they could
"consider it only for those purposes" because Ray
was "entitled to be tried for the crimes charged in this
case"-which didn't include any charges related to
the Lowry Park shooting-"and no other." We assume
the jury understood and followed this instruction. People
v. Kembel, 2023 CO 5, ¶ 50, 524 P.3d 18, 28. So,
even though the evidence wasn't admitted under Rule
404(b), the trial court essentially provided most of the
procedural protections required by that rule.

¶48
Finally, to the extent that some of the Lowry Park
evidence that the court admitted as res gestae wouldn't
have been admissible under Rule 404(b), it was mostly
cumulative. The court could have properly admitted evidence
establishing what happened at Lowry Park. That
evidence-whether outlined over two days or proved at a much
more granular level over two weeks-was always going to

be disturbing and potentially inflammatory. With that in
mind, we conclude that any incremental unfair
prejudice that might have resulted from the cumulative
evidence of the Lowry Park shooting was not enough to
substantially influence the verdict or render the Dayton
Street trial unfair overall. In short, the trial court's
erroneous decision to admit evidence of the Lowry Park
shooting as res gestae was harmless, despite our misgivings
about the quantity of evidence it chose to admit.

ii.
Threats to Brandi Taylor

¶49
In opening statements, the prosecutor explained that the
investigation into the Lowry Park shooting had run into a
"wall of silence"-for more than a year, no one was
willing to talk to the investigators. Things changed when
Brandi Taylor (Ray's brother's girlfriend) disclosed
what she knew.

¶50
The prosecutor explained that the detective investigating the
Dayton Street shooting had obtained a recorded phone call
between Ray and his brother, Dumas Brown, in which Ray said
that Taylor had been talking too much on the street and was
calling Ray a murderer. Ray also told Brown that he had
threatened to kill Taylor. The prosecutor played portions of
this recorded phone call for the jury. He then told the
jurors that it was only after the detective played this call
for Taylor that Taylor gave the investigators crucial
information about the Lowry Park shooting and the individuals
involved, which ultimately led investigators to the evidence
needed to charge Ray in this case.

¶51
The phone call was played twice more at trial: once during
Taylor's testimony and then again during Sailor's
(Ray's wife) testimony. Ray objected both times.

¶52
The threats against Taylor were extrinsic to the charged
offenses: they had nothing to do with Taylor potentially
testifying against Ray in his Lowry Park trial or with the
Dayton Street shooting. But because they could suggest that
Ray had a bad character-that is, that he was the sort of
person who threatened others- we consider their admissibility
under Rule 404(b) and Spoto.

¶53
Despite the prosecutor's explanation of the call's
significance during the opening statement, the prosecution
failed to explicitly make that connection during either
witness's testimony. Still, the call and the threats it
contained provided context for why Taylor was suddenly
willing to speak with the police and how investigators came
to suspect Ray in Marshall-Fields's and Wolfe's
murders. And the statements Taylor made after hearing those
threats, about hiding Ray's Suburban in her garage after
the Lowry Park shooting, tended to show that Ray had
consistently tried to evade responsibility for his
involvement in the Lowry Park shooting. Therefore, this
evidence was logically relevant to one or more material facts
(identity and motive) because it made it more likely that Ray
was involved in the Dayton Street shooting.

¶54
The evidence also, however, implicated the prohibited
propensity inference that, because Ray threatened to kill
Taylor, he likely made similar threats to other potential
witnesses. And because the prosecution didn't connect the
threats in the phone call to the subsequent investigation,
other than during the opening statement, the jurors were left
to make their own inferences about the evidence. Under these
circumstances, it is debatable whether the relevance of these
threats was truly independent of the prohibited propensity
inference.

¶55
Moreover, Ray wasn't charged with intimidating or
threatening Taylor; the threats weren't related to her
(or anyone else) being a witness; Taylor testified that she
didn't take Ray's threats seriously; and no limiting
instruction was given when the call was introduced. So, the
probative value of this evidence was substantially outweighed
by the risk that Ray would be unfairly prejudiced by it
because of the likelihood that the jurors would use the
prohibited propensity inference to convict him. We conclude,
therefore, that this evidence wasn't admissible under
Rule 404(b).

¶56
But the prosecutor's rebuttal closing argument mitigated
the potential prejudice. As she summarized various
witnesses' testimony and the evidence that had been
presented at trial, she said the following:

Brandi Taylor is a bit of a distraction in this case....
[Y]eah, she's important to the investigation. She's
not overwhelmingly important to determining the guilt of Mr.
Ray in this case. She's important to

the investigation because for the first time law enforcement
got a chink in that wall of silence.

¶57
Although a closing argument isn't evidence, this comment
provided the missing context and helped to minimize the
potential prejudice resulting from this evidence. Further,
the jury rendered a split verdict-it found Ray guilty of
intimidating Marshall-Fields but acquitted him of
intimidating Riley and Sailor-which indicates that the jurors
were able to evaluate witness credibility and thoughtfully
weigh the evidence and that they weren't unduly persuaded
by any propensity inference they may have made. See
Washington, ¶¶ 27, 31, 35-36, 547 P.3d at
1093-94. Accordingly, the error was harmless.

iii.
Threats to Askari Martin

¶58
Ray objected in pretrial motions and hearings to the
admissibility of evidence showing that he had threatened
Martin (a Lowry Park witness who had identified Ray as the
getaway driver) and had solicited anyone to kill Martin. He
also maintained continuing objections to this evidence at
trial. So, we review the trial court's erroneous
admission of this evidence as res gestae for harmlessness,
first addressing whether it was otherwise admissible.

¶59
Ray was charged with conspiring with Owens and Carter to
commit murder and with soliciting Owens, Carter, and Jamar
Johnson to commit murder. The prosecution argued that
evidence related to threats Ray allegedly made against Martin
(e.g., calling Martin a snitch and saying things to the
effect that snitches

should die) was relevant to show motive and to show the
scope, nature, and duration of the conspiracy between Ray and
his friends to eliminate Lowry Park witnesses. Thus, this
evidence was intrinsic because it was direct proof of the
charges in this case, and its admissibility was governed by
the general rules of relevance and prejudice. Rojas,
¶ 44, 504 P.3d at 308.

¶60
The threats against Martin were relevant because they made it
more likely that Ray committed the offenses of conspiracy and
solicitation. See CRE 401. Similarly, given that the
evidence was direct proof of some of the charges, was
probative of motive, and wasn't unfairly
prejudicial, we conclude that the probative value was not
substantially outweighed by the risk of unfair prejudice.
See Rath, 44 P.3d at 1043 (explaining that unfair
prejudice "refers only to 'an undue tendency on the
part of admissible evidence to suggest a decision made on an
improper basis' and does not mean prejudice that results
from the legitimate probative force of the evidence"
(quoting People v. Gibbens, 905 P.2d 604, 608 (Colo.
1995))).

¶61
Therefore, we conclude that the trial court's error in
admitting this evidence as res gestae was harmless because it
was otherwise admissible, relevant evidence.

iv.
Sailor's Black Eye

¶62
Before trial, the prosecution sought to introduce evidence
that Sailor (Ray's wife) and Ray had gotten into an
argument a few days before the Dayton Street

shooting, which resulted in Sailor having a black eye. The
prosecution argued the evidence was relevant because it would
(1) help Sailor determine a timeline for the weekend of the
Dayton Street shooting (e.g., she attended one of Ray's
pretrial hearings in the Lowry Park case that Friday, so the
hearing was before this fight because she wouldn't have
gone to the courthouse with a black eye) and (2) show
Ray's state of mind that same weekend, which supported
the prosecution's theory that Ray wasn't calmly
awaiting justice for the Lowry Park shooting but was nervous
and actively plotting to avoid conviction.

¶63
Defense counsel objected, arguing that if the only relevance
of Sailor's black eye was "to tie time frames,"
then the fact of Sailor's black eye could be admitted
without any evidence about how she got it. Moreover, even
accepting that Sailor's black eye had some probative
value as to Ray's state of mind the weekend of the Dayton
Street shooting, defense counsel argued it wasn't enough
to overcome the unfair prejudice.

¶64
The court admitted the black-eye evidence as res gestae of a
timeline for the weekend of the Dayton Street shooting and to
explain Sailor and Ray's estrangement that same weekend.

¶65
Because Ray objected to admission of this evidence, the issue
is preserved, and we review the court's error in
admitting this evidence as res gestae for harmlessness. The
evidence that Sailor got a black eye during an argument with

Ray the weekend of the Dayton Street shooting was extrinsic
to the charges in this case. It also suggested bad character;
that is, that Ray was a domestic abuser. So, we consider
admissibility under Rule 404(b) and Spoto.

¶66
Remember, the prosecution argued that Ray masterminded the
Dayton Street shooting because he wanted to avoid prison for
his role in the Lowry Park shooting. So, this evidence had
some tendency to show that Ray used his estrangement from
Sailor as a means to establish an alibi-he had receipts and
likely video surveillance from the store where he bought her
flowers, several people then saw him at Sailor's party
trying to make amends, and he spoke to her neighbor for a
while and accompanied the neighbor to a liquor store. Thus,
Ray's state of mind the weekend before his Lowry Park
trial was logically relevant to material facts (intent,
preparation, plan) concerning the Dayton Street conspiracy.
And this logical relevance was independent of the prohibited
bad-character inference.

¶67
In weighing the evidence's probative value against the
risk of unfair prejudice, however, we agree with defense
counsel that the probative value of the black-eye evidence
was substantially outweighed by the danger of unfair
prejudice. The prosecution could have established the same
proof by having Sailor testify that she had a black eye
without stating how she got it or by having witnesses testify
that Ray and Sailor were upset with each other that weekend

without even mentioning Sailor's black eye. The fact of
the black eye didn't prove that Ray used the disagreement
to further the conspiracy; instead, it served only to further
portray Ray as a generally violent person. See Martin v.
People, 738 P.2d 789, 794-95 (Colo. 1987).

¶68
Therefore, we conclude that the trial court erred by
admitting evidence about Sailor's black eye and how she
got it, and we now consider whether the error warrants
reversal.

¶69
The court instructed the jurors that they were to consider
the black-eye evidence only "for the purpose of
establishing a time line [sic] and a context for the status
of [Ray and Sailor's] relationship between June 17th and
June 21st, 2005." Sailor then explained that she and Ray
had gotten into a fight, and during the fight, she fell and
hit her head on the bed, which gave her a black eye. She
denied that Ray had hit her.

¶70
Considering the total length of Sailor's testimony, which
spanned one full day and two partial days of trial, the
questioning about her black eye was relatively brief and
peripheral. In the broader context of the four-week trial,
this black-eye evidence was even less significant.
Furthermore, we presume the jurors understood and followed
the court's limiting instruction. See Kembel,
¶ 50, 524 P.3d at 28. Consequently, the trial
court's error in admitting this evidence was

harmless. See People v. Herdman, 2012 COA 89,
¶¶ 61-62, 310 P.3d 170, 182; see also
Martin, 738 P.2d at 795.

b.
Teresa Riley's Inconsistent Statements About Threats to
Her Son

¶71
Having addressed Ray's challenges to the trial
court's admission of uncharged misconduct evidence as res
gestae, we now consider Ray's challenges to other
uncharged misconduct evidence that the court admitted for
other purposes. We begin with threats Ray allegedly made to
Lowry Park witness Teresa Riley's son, Mercedes.

¶72
During direct examination, the prosecutor asked Riley whether
she had told detectives that Ray had threatened Mercedes:

Q: My question to you was then you deny telling detectives of
the Aurora Police Department that Mercedes had been
threatened in connection with his failure to return La[T]oya
Ray's car?

A: No, no. And what do my kids have to do with this? They not
here on trial. What do my son have to do with this?

Q: Well, you had indicated that your son had been threatened?

A: I never-[Ray] never threatened my son. How many times do I
have to say this. Robert Ray has never threatened me or my
kids. ....

Q: Do you deny telling detectives back in September of 2005
that your son had been threatened by Robert Ray in connection
with the failure to return La[T]oya Sailor's car?

A: I'm fixing to laugh at this because this is crazy.
I'm tired of repeating myself. He never threatened my son
over anything, our car, a cigarette, nothing.

¶73
A few days later, outside the presence of the jury, the
prosecution sought to impeach Riley by introducing a portion
of a recorded interview in which Riley told a detective that
Ray had threatened Mercedes. Defense counsel objected, noting
that in the interview, Riley said Ray's sister, Markeeta,
threatened Mercedes, and because the prosecutor hadn't
asked Riley about Markeeta, the interview wasn't
admissible. After further argument, it became clear that
Riley told the detective that Ray had called Markeeta, told
Markeeta to call Mercedes, and then told Markeeta what to say
during the call (which included threatening Mercedes).
Because Riley testified that Ray had never threatened
Mercedes and denied that she told the detective that he had,
the court concluded that the recorded interview could be
played for the jurors to impeach Riley.

¶74
The prosecution subsequently asked the detective about her
interview with Riley and started to play the relevant portion
of the interview. Defense counsel objected while the
recording was playing. The prosecution countered that it was
impeachment evidence, and the court agreed, instructing the
jury that "what Ms. Riley is telling the detectives her
son told her cannot be considered as the truth by you,
that's hearsay. It is being offered for the impeachment
of whether or not

Ms. Riley knew that something had been-well, something about
her son. I'll leave it there." The clip was then
played in full.

¶75
"Impeachment is a technique used to attack the
truth-telling capacity of a witness [and] may be accomplished
by . . . contradicting the witness on specific facts in her
testimony." People v. Trujillo, 49 P.3d 316,
319-20 (Colo. 2002); see also § 16-10-201,
C.R.S. (2024). Here, the prosecution played the recording,
not to prove that Ray had threatened Mercedes but to attack
Riley's credibility. Riley's credibility was relevant
because Ray was charged with intimidating her as a witness.
So, the prosecution was entitled to impeach Riley's
credibility by showing that her in-court testimony that Ray
had never threatened her or her family was inconsistent with
her prior, out-of-court statements to the contrary.
See § 16-10-201.

¶76
Accordingly, we conclude that the trial court didn't
abuse its discretion by admitting the recording.

c.
Drug Dealing

¶77
Ray was charged in this case with drug dealing between
January 1, 2005, and June 20, 2005. The prosecution filed
pretrial notice of its intent to introduce uncharged
misconduct evidence related to Ray's drug dealing
before 2005. This evidence included several criminal
charges and various witnesses' observations of Ray's
drug business.

¶78
The trial court held a hearing to determine the admissibility
of this evidence under Spoto. First, it adopted the
prosecution's argument that the evidence was relevant to
show (1) motive-"to establish that that's why
allegedly Mr. Ray would have a witness killed, so that he
could stay out and make these large amounts of money";
(2) Ray's ability to "bribe the witnesses or to pay
to have someone killed"; and (3) the relationship of the
three co-defendants.

¶79
Next, the court explained that this evidence was logically
relevant because it provided a "logical explanation for
where these huge sums of money come from," given that
Ray was "a very young man" who wasn't
"otherwise employed." The court found that the
evidence also made the existence of the conspiracy more
likely because

Mr. Ray's involvement in these killings is on a
complicitor type of situation where he has directed or
orchestrated the situation and his relationship with the two
people who allegedly were the actual people who fired the
guns and killed the people, that there is logical relevance
from the fact that they are involved in a drug relationship.
There is logical relevance for the jury, if the jury chooses
to find that the-that relationship resulted in the killings
of Ms. Wolf[e] and Mr. Marshall-Fields.

¶80
The trial court then found that, although the drug-dealing
evidence suggested that Ray had a bad character, its
relevance to material facts was independent of that
prohibited inference. Lastly, the trial court determined that
this evidence had "substantial probative value"
that wasn't "substantially outweighed by unfair
prejudice." Based on these findings, the court concluded

that the pre-2005 drug-dealing evidence was admissible, but
it limited the scope of this evidence to a single 2003 arrest
where Ray was carrying over $2,500 in his shoe and to
testimony by Ray's wife, Sailor, and his friend, Checados
Todd, that Ray "ran a drug operation that involved Mr.
Carter and Mr. Owens" and had access to large amounts of
cash.

¶81
When this evidence was admitted during trial, the court gave
a limiting instruction that reminded the jurors that Ray
wasn't charged with any distribution offenses that
occurred before 2005 and that the evidence was being
introduced only to establish "motive, intent,
opportunity and identification." We perceive no abuse of
discretion in the court's Spoto analysis or in
its decision to admit evidence of Ray's pre-2005 drug
dealing.

2.
Tattoo Evidence

¶82
During cross-examination, defense counsel asked Sailor how
Ray was feeling as his Lowry Park trial approached:
"[A]lthough he wasn't happy about it, he was ready
to go to jail? . . . He was kind of accepting that, I'm
going to jail on this thing?" Sailor agreed with that
characterization.

¶83
On redirect, the prosecutor asked Sailor if she remembered
defense counsel asking her "about what attitude Mr. Ray
had expressed about his upcoming trial." When she said
she did, the prosecution then asked, "Between July 4th
of 2004 and June 20th of 2005, did Mr. Ray get a new tattoo
on his back that expresses an

attitude about crime?" Defense counsel objected on
relevancy grounds, and a bench conference followed.

¶84
During the bench conference, the prosecutor argued the tattoo
evidence was admissible because defense counsel had asked
Sailor whether Ray "express[ed] an attitude about his
upcoming trial. I think this is the expression of an attitude
not only about his upcoming trial but about crime." The
evidence at issue was a picture of Ray's back, which
showed a large tattoo depicting two guns, a stack of cash,
and the words "Crime Payz 999 Wayz"[4]:

(Image
Omitted)

¶85
The court ultimately found that defense counsel had opened
the door to this evidence by asking about whether Ray was
prepared to go to jail: "[T]he issue is

. . . his attitude that he was willing to take his punishment
and go to trial and go to jail and this shows an attitude of
someone who is favoring crime." So, the court concluded
that the tattoo evidence was admissible if Ray got the tattoo
between the Lowry Park and Dayton Street shootings. The
prosecutor then showed the photo to the jury, asked Sailor
questions about it, and pressed Sailor about whether Ray
really accepted that he was likely to go to prison for the
Lowry Park shooting. ¶86 "The concept of
'opening the door' represents an effort by courts to
prevent one party in a criminal trial from gaining and
maintaining an unfair advantage by the selective presentation
of facts that, without being elaborated or placed in context,
create an incorrect or misleading impression." Golob
v. People, 180 P.3d 1006, 1012 (Colo. 2008). Once one
party "opens the door" to otherwise inadmissible
evidence, the other party "may then inquire into the
previously barred matter." Id. But the concept
isn't unlimited and "inadmissible rebuttal evidence
'is permitted "only to the extent necessary to
remove any unfair prejudice which might otherwise have ensued
from the original evidence."'" People v.
Cohen, 2019 COA 38, ¶ 23, 440 P.3d 1256, 1262
(quoting United States v. Martinez, 988 F.2d 685,
702 (7th Cir. 1993)). In other words, this doctrine "can
be used only to prevent prejudice; it can't be used as an
excuse to inject prejudice into the case." Id.
at ¶ 23, 440 P.3d at 1262-63.

¶87
We conclude that the trial court abused its discretion by
admitting this evidence. The fact that Ray got a tattoo
depicting guns, money, and a song lyric doesn't rebut
Sailor's testimony that Ray was willing to face his
upcoming trial. Moreover, there is nothing connecting this
tattoo to Ray's motive or intent regarding the Dayton
Street shooting. The evidence simply wasn't relevant to
any material fact. And the risk of unfair prejudice that the
tattoo evidence introduced into trial substantially
outweighed any minimal probative value it arguably could have
provided. Thus, the tattoo evidence was inadmissible.

¶88
We further conclude, however, that the trial court's
erroneous admission of the tattoo evidence was harmless. The
prosecutor displayed the picture of the tattoo very briefly
and asked only two questions about it before taking it down.
The prosecution again mentioned the tattoo during rebuttal
closing argument:

Now, there is this very interesting photograph .... If you
really want to know what motivates a person, take a look at
what they permanently affix to their body.... This is
[Ray's] attitude towards his case, his attitude towards
crime, his attitude towards the system.... Not only is it his
motivation in his life, it is his motive for this murder.

This
comment, doubling down on the trial court's error, was
inappropriate, but it was also brief. Considering the
properly admitted testimony regarding Ray's attitude
about his upcoming trial and evidence about his illegal drug
operation, we conclude that the error didn't
substantially influence the jury's verdict or render the
trial unfair.

3.
Witness- and Victim-Fear Evidence

¶89
Ray argues that the trial court erred by admitting (1)
Marshall-Fields's out-of-court statements expressing his
fear of Ray and (2) evidence related to other witnesses'
fear of Ray or involvement in the witness protection program.
He argues that this evidence wasn't relevant to a
material issue, was unfairly prejudicial, and served only to
improperly appeal to the jurors' sympathies. We address
each category of evidence in turn.

a.
Marshall-Fields's Statements of Fear

¶90
More than two years before Ray's trial for the Dayton
Street shooting, the prosecution filed a notice of intent to
introduce various out-of-court statements made by
Marshall-Fields between the Lowry Park shooting and his
death. This motion was supplemented several times, with the
most relevant supplement filed in June 2008, nearly a year
before Ray's Dayton Street trial. In this motion, the
prosecution identified five categories of statements
Marshall-Fields had made that it sought to introduce. These
were statements in which Marshall-Fields described (1) the
Lowry Park shooting; (2) the encounter with Ray and his
associates at the June 19 Father's Day barbecue; (3) the
June 19 confrontation at Gibby's Bar; (4) various
attempts to prevent him from testifying, including incidents
that occurred on and before June 19; and (5) his fear of
being killed by Ray and his associates. The prosecution
argued these statements were admissible either

because they weren't hearsay or because they fell under a
hearsay exception-specifically, the then existing state of
mind exception, CRE 803(3); the excited utterance exception,
CRE 803(2); or the residual hearsay rule, CRE 807. The
prosecution also asserted the statements were relevant to
prove that Ray intimidated and attempted to bribe
Marshall-Fields and had conspired to have him killed. Ray
objected based on hearsay, relevance, and unfair prejudice.

¶91
At the subsequent motions hearing, the court adopted its
rationale from a pretrial order issued in Owens's case.
In that order, the court determined that some of
Marshall-Fields's statements were admissible to prove the
witness intimidation and witness bribery charges.

¶92
The court allowed Marshall-Fields's friends and family to
testify about statements Marshall-Fields had made to them,
describing incidents when Ray and his associates had
threatened or intimidated him and expressing his fear of Ray
and his associates. Specifically, the court admitted the
following categories of statements: (1) Marshall-Fields
telling his friends and his uncle about being threatened at
Gibby's Bar on June 19, 2005 (the day before his murder)
while he was still at the bar and soon after leaving; (2)
Marshall-Fields telling his friends about a dream he had
recently had in which God told him he was going to die; and
(3) Marshall-Fields telling his sister, on the day of his
murder, about the encounters at the Father's Day barbecue
and at Gibby's the day before.

¶93
Each time a witness testified about these statements, the
court instructed the jurors to consider them "only with
respect to the charge of intimidation of a witness or victim
in which Javad Marshall-Fields is the named victim," and
it reminded the jurors that "[s]uch statements cannot be
considered with respect to any other charge."

¶94
On appeal, Ray asserts that the trial court erred by
admitting MarshallFields's out-of-court statements. We
perceive no basis for reversal.

i.
Hearsay Overview

¶95
"'Hearsay' is a statement other than one made by
the declarant while testifying at the trial or hearing,
offered in evidence to prove the truth of the matter
asserted." CRE 801(c). Although hearsay is generally
inadmissible, CRE 802, there are several exceptions-notably
here, the excited utterance and state of mind exceptions, CRE
803(2), (3), and the residual hearsay rule, CRE 807.

¶96
The excited utterance exception allows a court to admit
hearsay statements if they relate "to a startling event
or condition made while the declarant was under the stress of
excitement caused by the event or condition." CRE
803(2). The state of mind exception allows a court to admit,
as relevant here, "[a] statement of the declarant's
then existing state of mind, emotion, sensation, or physical
condition (such as intent, plan, motive, design, mental
feeling, pain, and bodily health)." CRE 803(3). Lastly,
the residual hearsay rule provides that a hearsay statement

that isn't covered by the exceptions provided in Rules
803 and 804 may nonetheless be admissible if it has
"equivalent circumstantial guarantees of
trustworthiness," and

if the court determines that (A) the statement is offered as
evidence of a material fact; (B) the statement is more
probative on the point for which it is offered than any other
evidence which the proponent can procure through reasonable
efforts; and (C) the general purposes of these rules and the
interests of justice will best be served by admission of the
statement into evidence.

CRE
807. The residual hearsay rule also requires the proponent of
the statement to provide notice of its intent to introduce
the statement "sufficiently in advance of the trial or
hearing to provide the adverse party with a fair opportunity
to prepare to meet it." Id.; see also
Vasquez v. People, 173 P.3d 1099, 1106-07 (Colo. 2007).

ii.
Statements About Being Threatened at Gibby's

¶97
Most of the fear statements that Ray challenges on appeal
relate to an incident at Gibby's Bar on June 19, 2005,
the night before Marshall-Fields and Wolfe were murdered.
Earlier that day, Marshall-Fields had gone to a Father's
Day barbecue at a park with his friend, Brent Harrison.
Harrison testified that Marshall-Fields saw Ray and some of
Ray's friends and family there, which made
Marshall-Fields nervous. So, Harrison and Marshall-Fields
left the park and went to Marshall-Fields's apartment
where they made plans to go out that evening with some
friends.

¶98
After dinner, the group went to Gibby's for a drink. They
weren't there long before Marshall-Fields told them they
needed to leave. Once outside, MarshallFields said that the
guys he was going to testify against had come up to him in
the bar and said they were going to kill him. Marshall-Fields
also called his uncle and told him about what had just
happened. The uncle told him to leave the bar and come to his
house. So, Marshall-Fields and his friends left the bar;
stopped briefly by their apartment complex; and then drove to
his uncle's house, dropping Harrison off on the way. Once
Marshall-Fields got to his uncle's house, he called his
friend Thomas Goodish and told him about the incident at
Gibby's.

¶99
In its pretrial order, the court ruled that these statements
Marshall-Fields made "about the incident at Gibby's
Bar on June 19, 2005, are admissible under CRE 803(2), 803(3)
and 807 with a limiting instruction that the evidence can
only be considered on Counts 14 and 19 [witness intimidation
and bribery]." We perceive no abuse of the trial
court's discretion because the statements were admissible
under the excited utterance exception to the hearsay rule.

¶100
The admissibility of an excited utterance rests on the idea
that the event was "sufficiently startling to render
normal reflective thought processes of the declarant
inoperative," Compan v. People, 121 P.3d 876,
882 (Colo. 2005), overruled on other grounds by
Nicholls, ¶ 33, 396 P.3d at 682, eliminating
"the possibility of fabrication, coaching, or
confabulation," People v. Vanderpauye, 2023 CO
42, ¶ 41, 530 P.3d 1214, 1225

(quoting Idaho v. Wright, 497 U.S. 805, 820 (1990)),
and lending the statement "sufficient trustworthiness to
overcome the hearsay rule's proscription,"
id. So, to be admissible as an excited utterance,
the proponent of the statement must show that "(1) the
event was sufficiently startling to render normal reflective
thought processes of the observer inoperative; (2) the
statement was a spontaneous reaction to the event; and (3)
direct or circumstantial evidence exists to allow the jury to
infer that the declarant had the opportunity to observe the
startling event." Id. at ¶ 42, 530 P.3d at
1225 (quoting People v. Pernell, 2014 COA 157,
¶ 31, 414 P.3d 1, 7). In determining admissibility,
courts may consider factors such as "the lapse of time
between the startling event or condition and the out-ofcourt
statement; whether the statement was a response to an
inquiry; whether the statement is accompanied by outward
signs of excitement or emotional distress; and the
declarant's choice of words to describe the startling
event or condition." Compan, 121 P.3d at 882.

¶101
Here, we know Marshall-Fields had an opportunity to observe
the startling event because Ray's associate, Parish
Carter, threatened him directly. But whether these statements
qualified as an excited utterance hinges on temporal
proximity.

¶102
We have previously held that "[w]hile the temporal
proximity of the statement to the startling event or
condition is important, the two do not have to be
contemporaneous if the declarant is still under stress when
the statement is

made." Id. But we have more recently concluded
that "where the time interval between the event and the
statement is long enough to permit reflective thought, the
statement will be excluded in the absence of some proof that
the declarant did not in fact engage in a reflective thought
process." Vanderpauye, ¶ 47, 530 P.3d at
1226 (quoting 2 Kenneth S. Broun et al., McCormick on
Evidence § 272 (Robert P. Mosteller ed., 8th ed.),
Westlaw (database updated July 2022)). In
Vanderpauye, however, we were considering the
temporal proximity of a defendant's selfserving
statements, not a victim's spontaneous reaction to a
startling event. We noted that "[t]he temporal element
takes on added significance when a defendant's
out-of-court statement is self-serving," id.,
and the fact that a statement is self-serving is itself
"an indication that the statement was the result of
reflective thought," id. at ¶ 46, 530 P.3d
at 1226 (quoting 2 Broun et al., supra, § 272).

¶103
Here, there was nothing self-serving about
Marshall-Fields's statements. Being told he was going to
be killed was sufficiently startling to render
MarshallFields's immediate retelling of the threat to his
friends and his uncle spontaneous: He told them what happened
within minutes of being threatened and while he was still
upset about the incident. See Pena v. People, 173
P.3d 1107, 1112 (Colo. 2007); see also People v.
Rogers, 68 P.3d 486, 493 (Colo.App. 2002). Although he
told Goodish about the incident thirty minutes to an hour
later, by all accounts he was still visibly upset about it.
See Compan, 121 P.3d at 882; People v.
Hagos, 250 P.3d 596, 622-23 (Colo.App. 2009);

see also People v. Lagunas, 710 P.2d 1145, 1148
(Colo.App. 1985) ("Because the duration of stress will
obviously vary with the intensity of the experience and the
emotional endowment of the individual, the exception
necessarily vests the trial court with broad discretion in
applying the rule.").

¶104
We therefore conclude that the trial court didn't abuse
its discretion by admitting the statements under the excited
utterance exception.[5]

iii.
Statements About Marshall-Fields's Dreams

¶105
Marshall-Fields's friend, Stephanie Hayashido, testified
that, while they were at the apartment complex after leaving
Gibby's, Marshall-Fields told her that "he had a
dream and he said that it was a sign from God that he was
going to die because he died in his dream, or that God told
him he was going to die in his dream." Defense counsel
objected, but the court determined the statement was
admissible to show Marshall-Fields's state of mind, which
was relevant to the intimidation charge.

¶106
Although fear statements may be admissible if the
victim's state of mind is at issue, People v.
Acosta, 2014 COA 82, ¶¶ 84-91, 338 P.3d 472,
486-87; CRE 803(3), Marshall-Fields's state of mind
wasn't at issue here. A defendant commits the offense of
witness intimidation if he intentionally uses threats or
harassment to intimidate a witness. § 18-8-704(1)(a).
But the prosecution doesn't need to prove that the
witness was actually intimidated. So, Marshall-Fields's
state of mind-that is, whether he was scared or felt
intimidated-wasn't directly relevant to a material
fact.[6]

¶107
Even when a victim's state of mind isn't at issue,
the victim's statements of fear may nonetheless be
admissible to prove identity, motive, or intent, or to rebut
certain defenses, such as accident or self-defense.
E.g., People v. Madson, 638 P.2d 18, 28-29
(Colo. 1981). But we've only invoked this reasoning in
homicide cases and, even then, only rarely because
"[t]he problem with using evidence of a victim's
fear of another to prove identity, motive, malice, or intent
in a homicide case is that the victim's statements would
be 'used indirectly to infer the defendant's past
conduct (a threat or an assaultive act) from which his future
conduct and state of mind are inferred.'"
Rogers, 68 P.3d at 493 (quoting Madson, 638
P.2d at 29 n.14).

¶108
Here, although evidence showing that Marshall-Fields was
scared and was having dreams about dying shortly before he
was killed may have had some probative value to prove
identity and intent (that Ray was attempting to intimidate
Marshall-Fields to keep him from testifying), the statements
weren't introduced to prove the murder charges-the court
admitted them only for the intimidation and bribery charges.
Moreover, any probative value these statements might have had
was minimal and was substantially outweighed by the risk of
unfair prejudice. See CRE 403.

¶109
We therefore conclude that the trial court abused its
discretion by admitting the statements Marshall-Fields made
about his dream. However, considering the

properly admitted fear statements and the brevity of
questioning about the dream statements, we conclude that the
error was harmless. See Zapata, ¶ 62, 428 P.3d
at 530.

iv.
Statements Made the Day of Marshall-Fields's
Murder

¶110
Ray challenges the trial court's admission of statements
Marshall-Fields made "to Maisha Pollard [his sister]
about the incidents at the Park Hill barbecue and at
Gibby's Bar on June 19, 2005." The court found these
statements "admissible under CRE 803(2), 803(3) and 807
with a limiting instruction that the evidence can only be
considered on Counts 14 and 19 [witness intimidation and
bribery]." (Footnote omitted.)

¶111
At trial, Pollard testified that Marshall-Fields called her
on June 20, 2005 (the day he was killed), and "seemed
very discombobulated," which she said wasn't common
for him. She said that "[h]e was very confused,
agitated, anxious, fearful," and he told her,
"[T]hese dudes are after me.... [T]he dudes I'm
testifying against.... I keep seeing them. I keep seeing them
everywhere I go. They were at the store and then they were at
the barbe[c]ue and then I saw them again.... [T]he people who
shot me, . . . the people I'm testifying against."

¶112
"A victim's statements to the effect that she was,
at the time, afraid of another fall squarely within the state
of mind hearsay exception under CRE 803 because they refer
not to past events or conditions, but to the victim's
then existing

state of mind." Cross, ¶ 32, 531 P.3d at
451 (quoting Rogers, 68 P.3d at 493). And under
these circumstances, we perceive no abuse of discretion in
the trial court's admission of these statements under the
state of mind exception to the hearsay rule.[7] See CRE
803(3); People v. Haymaker, 716 P.2d 110, 113 n.3
(Colo. 1986).

b.
Other Witnesses' Statements of Fear

¶113
Ray asserts that the trial court improperly admitted evidence
about various witnesses' fear of Ray, evidence about
those witnesses' reluctance to testify, evidence that
some witnesses were under witness protection, and evidence
that some witnesses might be biased because the prosecution
had given them preferential deals in other cases. Ray
preserved these issues with contemporaneous objections at
trial.

¶114
"Within broad limits," evidence may be admissible
if it tends to show bias or prejudice, sheds light on a
witness's inclinations, or explains that a witness's
"change in statement or reluctance to testify" was
because of a fear of retaliation. People v.
Villalobos, 159 P.3d 624, 630 (Colo.App. 2006);
accord People v. James, 117 P.3d 91, 94 (Colo.App.
2004). A witness is also "allowed to explain or rebut
any adverse inferences resulting from cross-examination in
order to place matters

in context so that the jury can evaluate the existence and
significance of a witness's alleged bias."
People v. Lesney, 855 P.2d 1364, 1367 (Colo. 1993).

¶115
Here, the trial court admitted the challenged evidence to
explain some witnesses' reluctance to testify or changes
in some witnesses' testimony, or to rebut the assertion
that witnesses weren't credible because they were being
paid for their testimony or were being helped by the
prosecution in other cases in exchange for favorable
testimony.

¶116
Thus, we perceive no abuse of discretion in the trial
court's admission of this evidence.

4.
Victim-Impact Evidence

¶117
Ray alleges that the trial court erred by allowing the jurors
to hear "extensive, gratuitous" victim-impact
evidence related to the Lowry Park shooting during the guilt
phase of his trial. Elvin Bell testified at Ray's trial
for the Dayton Street shooting. Bell's brother, Gregory
Vann (Marhsall-Fields's co-host at the Lowry Park rap
battle and barbecue), was shot and killed during the Lowry
Park shooting. Bell was also shot. Ray challenges the
court's admission of Bell's testimony about
Vann's personality, work, and hobbies, and about the
impact watching Vann die had on him. Ray preserved the issue
by moving before trial to exclude victim-impact evidence
during the guilt phase of trial. Ray also challenges the
prosecution's use of photos that depicted
Marshall-Fields's injuries from the

Lowry Park shooting at various times throughout the trial to
maximize their emotional impact on the jury. Ray didn't
object when these photos were introduced.

¶118
"Victim impact evidence is evidence that relates to
'the victim's personal characteristics and to the
physical, emotional, or social impact of a crime on its
victim and the victim's family.'" People v.
Martinez, 2020 COA 141, ¶ 29, 486 P.3d 412, 419
(quoting Schreibvogel v. State, 228 P.3d 874, 883
(Wyo. 2010)). Victimimpact evidence is often relevant and
admissible at the sentencing phase of trial, but only as it
relates to the crimes for which the defendant is currently
being sentenced. People v. Dunlap, 975 P.2d 723,
744-45 (Colo. 1999); see also §
18-1.4-102(1)(a)-(b), C.R.S. (2024); §
18-1.3-1201(1)(a)-(b), C.R.S. (2024).

¶119
We haven't addressed whether victim-impact evidence is
ever admissible during the guilt phase of a trial, though a
division of the court of appeals has. See Martinez,
¶¶ 32-34, 486 P.3d at 419-20. In Martinez,
the division held that, under the facts of that case,
victim-impact evidence was irrelevant and thus inadmissible
during the guilt phase of a trial. Id. The division
reasoned that "victim impact evidence is admissible only
if it 'tends to show the context or circumstances of the
crime itself.'" Id. at ¶ 34, 486 P.3d
at 420 (quoting State v. Graham, 650 S.E.2d 639, 646
(N.C. Ct. App. 2007)). In other words, although
victim-impact evidence may be admissible if it's
"'relevant to determining whether the defendant
committed

the crime' for which they were charged," People
v. Mena, 2025 COA 14, ¶ 15, 567 P.3d 161, 164-65
(quoting Martinez, ¶ 33, 486 P.3d at 420),
"[b]ecause 'the effect of a crime on a [victim or
the] victim's family often has no tendency to prove
whether a particular defendant committed a particular
criminal act against a particular victim,' such evidence
is generally irrelevant during the guilt/innocence phase of a
trial," Martinez, ¶ 33, 486 P.3d at 419
(alteration in original) (quoting Graham, 650 S.E.2d
at 645). And even if a court determines such evidence is
relevant, the court must still weigh the probative value of
the evidence against the risk of unfair prejudice before
admitting it. CRE 403.

¶120
Here, the trial court ruled that victim-impact
evidence-specifically, "evidence about the grieving,
sadness, and loss that resulted from that incident" and
evidence about "how someone felt when they saw their
brother on the ground shot and murdered"-would be
inadmissible during the guilt phase of the trial. The court
clarified that it would, however, allow evidence during the
guilt phase describing "the victim and the life that was
taken . . . [witnesses] can talk about the life of the
person." Regarding the prosecution's use of
pictures, the court said it would have to make those rulings
in the context of trial.

¶121
At trial, Bell briefly described Vann's hobbies and
interests and then discussed the Lowry Park shooting in
greater detail. But his testimony didn't discuss the
effect Vann's death had on him or his family and, for the
most part,

just described his personal experience at Lowry Park.
Similarly, the pictures depicting Marshall-Fields's
injuries from the Lowry Park shooting were used to help
describe those injuries and didn't constitute
victim-impact evidence. Hence, we perceive no abuse of the
trial court's discretion in admitting this evidence.

5.
Positive Character Evidence

¶122
Ray contends that the trial court erred by admitting
extensive and impermissible positive evidence about
Marshall-Fields's and Wolfe's character that
"emotionally hijack[ed] the jury's attention."
Specifically, he challenges the court's admission of (1)
testimony from several of Marshall-Fields's friends and
family, regarding his life, character, values, education,
work, plans for the future, relationships with Wolfe and with
his nieces, family vacations, and more; and (2) testimony
from Wolfe's mother, identifying an in-life photograph of
Wolfe and talking about Wolfe's background, education,
plans, and her relationship with Marshall-Fields. Ray
objected to this evidence at trial.

¶123
The admissibility of evidence related to a victim's good
character is limited during the guilt phase of trial. Under
CRE 404(a)(2), the prosecution may introduce (1) evidence of
a victim's pertinent character trait to rebut defense
evidence of the same trait or (2) evidence of the
victim's peaceful character to rebut evidence that the
victim was the initial aggressor in a homicide case. See
People v. Miller, 890 P.2d 84, 96 (Colo. 1995)
(explaining that "character evidence is

'pertinent' to the crime charged [if] there is some
nexus between the proffered character trait and the crime
charged").

¶124
Similarly, although in-life photographs of a homicide victim
may be "admissible if they depict relevant facts,"
such photographs shouldn't be admitted if they are
"unnecessarily inflammatory." People v.
McClelland, 2015 COA 1, ¶ 45, 350 P.3d 976, 984.
So, for example, in-life photographs may be admissible to
show "the appearance of the victim, the location and
nature of his wounds, or his identity." People v.
White, 606 P.2d 847, 849 (Colo. 1980). But courts must
still weigh the probative value of such photographs against
"the danger that their introduction is merely a means of
'engendering sympathy for the victim with the intent of
creating an atmosphere of prejudice against the
defendant.'" McClelland, ¶¶
46-47, 350 P.3d at 984 (quoting Commonwealth v.
Rivers, 644 A.2d 710, 716 (Pa. 1994)); see also
People v. Loscutoff, 661 P.2d 274, 277 (Colo. 1983)
(concluding that the trial court didn't abuse its
discretion by admitting photographs of a murder victim and
her young son, taken several months before the murder,
because they were relevant to prove identity and their
probative value outweighed any prejudicial effect).

¶125
The trial court's pretrial ruling, allowing witnesses to
"talk about the life of the person," encompassed
some evidence about Marshall-Fields's and Wolfe's
lives. During the trial, however, numerous witnesses
repeatedly testified about

Marshall-Fields's and Wolfe's positive character
traits, and the prosecution introduced several in-life
pictures of them, both together and separately. None of this
more extensive evidence was probative of any material fact or
made it more likely that Ray committed the offenses charged.
See People v. Jones, 743 P.2d 44, 46 (Colo.App.
1987). Moreover, it engendered sympathy that could have
interfered with the jury's ability to render an impartial
verdict based on the legally relevant facts. Accordingly, we
conclude that the trial court abused its discretion by
admitting evidence related to Marshall-Fields's and
Wolfe's good character during the guilt phase of the
trial.

¶126
But this evidence constituted a relatively small portion of
the trial, and the jurors were properly instructed on their
duty to weigh all the evidence and to determine the elements
of each offense beyond a reasonable doubt. We presume they
did so. See Washington, ¶¶ 25-27, 547 P.3d
at 1092-93. Therefore, these errors were harmless.

B.
Prosecutorial Misconduct

¶127
Ray asserts the prosecution committed misconduct by (1) using
language that encouraged jurors to rely on racial bias and
prejudice in reaching their verdict, (2) emphasizing the
grand jury's decision to indict, (3) diluting the
presumption of innocence, and (4) improperly appealing to the
jurors' sympathies. In reviewing allegations of
prosecutorial misconduct, we engage in a two-step

process where "[e]ach step is analytically independent
of the other." People v. Robinson, 2019 CO 102,
¶ 18, 454 P.3d 229, 233.

¶128
First, we must determine whether misconduct
occurred; that is, whether the prosecution's conduct was
improper "in the context of the argument as a whole and
in light of the evidence before the jury." People v.
Strock, 252 P.3d 1148, 1153 (Colo.App. 2010); see
also Robinson, ¶ 18, 454 P.3d at 233.
"Determining whether a prosecutor's actions
constitute misconduct 'is generally a matter left to the
trial court's discretion,'" People v.
Snider, 2021 COA 19, ¶ 31, 491 P.3d 423, 431
(quoting Domingo-Gomez v. People, 125 P.3d 1043,
1049 (Colo. 2005)), so we review the record for an abuse of
that discretion, see Wend v. People, 235 P.3d 1089,
1097 (Colo. 2010). ¶129 Prosecutors are generally given
"wide latitude to make arguments based on facts in
evidence and reasonable inferences drawn from those
facts." Strock, 252 P.3d at 1153. And while
prosecutors "can use every legitimate means to bring
about a just conviction," they have "a duty to
avoid using improper methods designed to obtain an unjust
result." Domingo-Gomez, 125 P.3d at 1048.
Comments calculated to mislead the jury or that suggest the
prosecution has access to evidence the jurors don't are
improper. Id. at 1048-49. So too are comments
"'calculated to inflame the passions or prejudice of
the jury'" and "arguments that tend to
influence jurors to reach a verdict based on preexisting
biases." Robinson,

¶ 20, 454 P.3d at 233 (quoting Dunlap, 975 P.2d
at 758); see also Domingo-Gomez, 125 P.3d at
1048-49.

¶130
Second, if we determine the prosecution's
comments were improper, we then consider whether that
misconduct warrants reversal under the appropriate standard.
Robinson, ¶ 18, 454 P.3d at 233. "To
determine whether prosecutorial misconduct requires reversal,
we must evaluate the severity and frequency of the
misconduct, any curative measures taken by the trial court to
alleviate the misconduct, and the likelihood that the
misconduct constituted a material factor leading to the
defendant's conviction." Strock, 252 P.3d
at 1153.

¶131
If a defendant fails to object to the alleged misconduct at
trial, we review for plain error. Robinson, ¶
19, 454 P.3d at 233. To warrant reversal under this standard,
the prosecutorial misconduct must have been "flagrantly,
glaringly, or tremendously improper." Id.
(quoting Domingo-Gomez, 125 P.3d at 1053). After
all, "counsel's failure to object . . . may
'demonstrate defense counsel's belief that the live
argument, despite its appearance in a cold record, was not
overly damaging.'" Strock, 252 P.3d at 1153
(quoting People v. Rodriguez, 794 P.2d 965, 972
(Colo. 1990)). But if the defendant preserves the error with
a contemporaneous objection, we review for harmlessness.
Wend, 235 P.3d at 1097.

1.
Racial Bias

¶132
Ray alleges the prosecution injected racial bias into the
proceedings by using the N-word[8] twenty-four times and by
repeatedly quoting Owens's alleged comment to Ray after
the Dayton Street shooting that "it's
'tooken' care of."

¶133
"The Constitution prohibits racially biased
prosecutorial arguments." McCleskey v. Kemp,
481 U.S. 279, 309 n.30 (1987); see also Robinson,
¶ 21, 454 P.3d at 233 ("Although all appeals to
improper biases pose challenges to the trial process, the
Supreme Court has observed that an appeal to racial bias
should be treated with 'added precaution' because
'racial bias implicates unique historical,
constitutional, and institutional concerns.'"
(quoting Pena-Rodriguez v. Colorado, 580 U.S. 206,
224-25 (2017))). But "it 'is not enough that the
prosecutors' remarks were undesirable or even universally
condemned.'" Darden v. Wainwright, 477 U.S.
168, 181 (1986) (quoting Darden v. Wainwright, 699
F.2d 1031, 1036 (11th Cir. 1983)). "The relevant
question is whether the prosecutors' comments 'so
infected the trial with unfairness as to make the resulting
conviction a denial of due process.'" Id.
(quoting Donnelly v. DeChristoforo, 416 U.S. 637,
643 (1974)); see also Robinson, ¶ 28, 454 P.3d
at 234.

¶134
Here, each time the prosecution used the N-word, they were
quoting Ray's own words. Similarly, the prosecution's
use of "tooken" was in reference to Owens's own
words. Ray didn't contemporaneously object to the
prosecution's failure to paraphrase or modify this
language, so we will assume, without deciding, that the
prosecution engaged in misconduct by failing to paraphrase or
modify Ray's and Owens's language and pivot to
whether this misconduct was plain, which, again in this
context, means glaringly improper.

¶135
To evaluate whether the prosecution's use of the
challenged language was glaringly improper, we must consider
the broader context in which it emerged at trial. Here, the
prosecution didn't unduly highlight the offensive
language or imply any prejudicial meaning from it. Cf.
State v. Monday, 257 P.3d 551, 557 (Wash. 2011)
(concluding that it was "highly improper" for the
prosecutor to "subtly, and likely deliberately, call to
the jury's attention" the race of a witness by using
specific language and to imply that the witness wasn't
credible because of her race). In most instances, the
prosecution simply asked witnesses if they remembered Ray or
Owens saying the quoted language and then moved on. Several
of the witnesses also spontaneously used similar language
during their testimony. Although the prosecution repeated the
language in closing argument, the reference was brief and not
overtly gratuitous. And the court instructed the jurors that
"[n]either sympathy nor prejudice should influence
[their] decision."

We once again presume the jury followed this instruction.
See Robinson, ¶ 32, 454 P.3d at 235.

¶136
So, although we strongly condemn any prosecutor's use of
language that may encourage reliance on racial prejudices, we
conclude that the comments didn't so undermine the
fundamental fairness of the trial as to cast serious doubt on
the reliability of the conviction. See Hagos, ¶
14, 288 P.3d at 120; see also Robinson, ¶¶
28-34, 454 P.3d at 234-35; Commonwealth v. Chalue,
162 N.E.3d 1205, 1239 (Mass. 2021); State v.
Haithcox, 447 P.3d 452, 460-61 (Mont. 2019).

2.
Grand Jury Reference

¶137
Ray contends that the prosecutor improperly referenced the
grand jury indictment in rebuttal closing. We disagree.

¶138
During closing argument, defense counsel told the jury that
"it's important for you to realize the motives and
the concerns of the other side." Counsel then described
the lack of follow-through and the mistakes investigators had
made in the Lowry Park investigation. He argued that these
failures affected the Dayton Street investigation because the
media, politicians, and heads of both the police department
and the district attorney's office pressured the Dayton
Street investigators and prosecutors "to make this
right." Counsel further argued that these pressures were
compounded by investigators' and prosecutors'
heightened emotions and personal involvement with these
cases, which caused a "massive

overreaction, overcharging, [and] overzealousness" in
response to the Dayton Street shooting.

¶139
In rebuttal closing, the prosecutor responded:

There was a comment that somehow the press and political
desires put a lot of pressure on this process and apparently
caused the wrong person to be charged. Well, you didn't
hear any evidence about that.... [N]othing about press
putting pressure on anyone, nothing about political
motivations, nothing about people possibly losing their jobs
if they couldn't solve this case, et cetera.

This is a case where a Grand Jury made a decision. Grand Jury
took testimony, heard evidence and decided to charge, among
other people, Mr. Ray.

Defense
counsel objected, and the court reminded the jury "that
an indictment is not evidence of anything." The
prosecutor continued: "Indictment is not evidence, but
it was a Grand Jury that . . . made the decision to have Mr.
Ray charged with these crimes."

¶140
Prosecutors are allowed to respond to defense counsel's
arguments and may argue the facts in evidence, the reasonable
inferences to be drawn from those facts, and any lack of
support for the defendant's theory of defense. Hafer
v. People, 492 P.2d 847, 851 (Colo. 1972); People v.
Walker, 2022 COA 15, ¶¶ 39-40, 509 P.3d 1061,
1071; People v. Carter, 2015 COA 24M-2, ¶¶
71-72, 402 P.3d 480, 494. But it is inappropriate for a
prosecutor to make remarks that have the "potential to
convey that the prosecution had additional inculpatory
evidence unknown to the jury." Domingo-Gomez,
125 P.3d at 1052. Such "remarks of personal knowledge,

combined with the power and prestige inexorably linked with
the office may encourage a juror to rely on the
prosecution's allegation that unadmitted evidence
supports a conviction." Id.

¶141
Here, the prosecutor's reference to the grand jury's
indictment didn't suggest she had access to evidence the
jurors didn't. See id. Rather, when viewed in
context, it was a direct response to defense counsel's
argument that Ray was charged only because of outside
pressures and not because there was solid evidence against
him. See Denhartog, ¶ 55, 452 P.3d at 158;
People v. Douglas, 2012 COA 57, ¶ 68, 296 P.3d
234, 249-50. It also reminded the jurors that defense
counsel's allegations of improper motives weren't
evidence. See People v. Sanders, 2022 COA 47, ¶
54, 515 P.3d 167, 179, aff'd on other grounds,
2024 CO 33, 549 P.3d 947; Denhartog, ¶ 53, 452
P.3d at 158.

¶142
Under these circumstances, we conclude that the
prosecutor's reference to the grand jury's indictment
wasn't improper.

3.
Presumption of Innocence

¶143
Ray contends that the prosecutor diluted the presumption of
innocence and violated his constitutional rights during
rebuttal closing argument by saying:

Now, it is true that at the beginning of a trial every
defendant is presumed to be not guilty unless and until the
prosecution has proven beyond a reasonable doubt that in fact
he is guilty.

The evidence in this case has proven beyond any reasonable
doubt that the defendant, Mr. Ray, committed these crimes in
order,

once again, to avoid being held accountable. He did not want
to be held accountable for his involvement in the [Lowry
Park] shooting. He was not a killer in that case because he
did not want that motivation, that money to disappear.

At this time, the evidence has proven that he is guilty and
the prosecution would ask that you hold him accountable. You
hold him accountable for committing these terrible crimes in
order to avoid being held responsible in the past, and we
would ask that you find him guilty.

¶144
Divisions of our court of appeals have regularly disapproved
of comments that suggest "that the presumption of
innocence that had existed when the trial began was
'gone' because of the presentation of evidence."
People v. Conyac, 2014 COA 8M, ¶ 141, 361 P.3d
1005, 1029; accord, e.g., People v. Ujaama,
2012 COA 36, ¶¶ 73-74, 302 P.3d 296, 311;
People v. McBride, 228 P.3d 216, 224 (Colo.App.
2009). In McBride, for example, the division
concluded that the prosecutor erred by telling the jurors
during closing argument that the defendant "sits here in
front of you a guilty man. That presumption of innocence that
we had when we started this case is gone." 228 P.3d at
223. The prosecutor also "told jurors not to begin their
deliberations at 'not guilty' because,
'You're about [ten] miles from not guilty before you
even start deliberating.'" Id. Such
comments are improper because "[a] defendant retains the
presumption of innocence throughout the trial
process unless and until the jury returns a guilty
verdict," and so, "as a jury evaluates the
evidence, it must continue to presume the defendant innocent
until it concludes that the evidence proves guilt beyond a
reasonable doubt." Conyac, ¶ 141, 361 P.3d
at 1029

(emphases added); People v. Estes, 2012 COA 41,
¶¶ 32-33, 36, 296 P.3d 189, 195 ("[A] comment
that suggests to a jury that the presumption of innocence may
be eliminated at any time before the jury arrives at a guilty
verdict-whether upon the close of evidence, or otherwise-is a
misstatement of the law.").

¶145
We conclude that the prosecutor's comments here, while
perhaps inartful, weren't improper. See McBride,
228 P.3d at 221. Unlike in McBride, the prosecutor
here didn't encourage the jury to find that the
presumption of innocence had been overcome even before
deliberations commenced. And even if we were to infer that
the prosecutor insinuated as much, defense counsel didn't
object, and the error wasn't plain.

¶146
For an error to be plain, it must be obvious. And for an
error to be obvious, it "must contravene a clear
statutory command, a well-settled legal principle, or
established Colorado case law." People v.
Crabtree, 2024 CO 40M, ¶ 42, 550 P.3d 656, 667. We
evaluate obviousness at the time the error is made.
Id. at ¶ 4, 550 P.3d at 660. Although a
defendant's right to be presumed innocent throughout the
trial was well-settled during Ray's trial, the first
appellate opinion to explicitly disapprove of comments at all
like those the prosecutor made here wasn't announced
until after Ray's trial. See McBride, 228 P.3d
at 224 (announcing the opinion on October 1, 2009, nearly
five months after closing arguments in Ray's

trial). Therefore, any error wasn't plain and doesn't
warrant reversal. See Conyac, ¶ 143, 361 P.3d
at 1029; see also Ujaama, ¶¶ 73-74, 302
P.3d at 311.

4.
Emotional Appeal to Juror Sympathies

¶147
Defense counsel argued in closing that the prosecution wanted
the jurors "to substitute common sense and suspicion for
proof beyond a reasonable doubt." He said that although
the prosecution had talked "about a lot of things that
could have happened, that it could be that Robert Ray made
these orders, it could be that Robert Ray instructed these
people," there was "[n]o reliable proof of any of
that.... They're hoping that you substitute this
suspicion, this emotion of this case for reasonable
doubt." Defense counsel acknowledged that this was
"an emotional case. It's a horrible, horrible crime,
no question about it. These poor people have had to go
through losing a loved one at such a young age and not
knowing what happened or why." But he reminded the
jurors that they had "sworn a duty to not let bias or
your emotions influence you."

¶148
In rebuttal closing, the prosecutor responded to defense
counsel's comments:

[Defense counsel] pointed out that the families of Javad
Marshall-Fields and Vivian Wolfe have suffered. They had to
suffer the tragedy of burying a child. And he indicated that
they had to do that without knowing what had happened or why.

Well, you all do know what happened and you do know why.

¶149
Ray contends that this comment improperly appealed to the
jurors' passions and sympathies. We disagree.

¶150
A "prosecutor should not make arguments that encourage
the jury to depart from its duty to decide the case on the
evidence and the inferences reasonably derived
therefrom." Dunlap, 975 P.2d at 758-59 (quoting
Standards for Crim. Just., Prosecution Function &Def.
Function § 3-5.8, comment. at 109 (Am. Bar Ass'n, 3d
ed. 1993)). The prosecutor's comments here mirrored
defense counsel's own words and were a response to
defense counsel's argument about the lack of evidence;
they didn't improperly appeal to juror sympathies.
Cf. People v. Vasquez, 2022 COA 100, ¶ 68, 521
P.3d 1042, 1055-56 (concluding that it was improper for the
prosecutor to call the case "'a tragedy' for the
victim and her family," to characterize the trial as
"a public reckoning," and to tell the jury it was
"the conscience of our community").

¶151
We therefore conclude that these comments weren't
improper.

C.
Cumulative Error

¶152
Ray contends that the trial court's numerous evidentiary
errors and the prosecution's misconduct constitute
cumulative error that violated his right to a fair trial. We
disagree.

¶153
The cumulative error doctrine recognizes that although
individual errors viewed in isolation may be harmless,
"numerous formal irregularities . . . may in

the aggregate show the absence of a fair trial."
People v. Vialpando, 2022 CO 28, ¶ 33, 512 P.3d
106, 114 (quoting Howard-Walker v. People, 2019 CO
69, ¶ 24, 443 P.3d 1007, 1011). After all, a
defendant's constitutional right to a fair trial includes
the right to an impartial jury-a right that "comprehends
a fair verdict, free from the influence or poison of evidence
which should never have been admitted, and the admission of
which arouses passions and prejudices which tend to destroy
the fairness and impartiality of the jury."
Howard-Walker, ¶ 23, 443 P.3d at 1011 (quoting
Oaks v. People, 371 P.2d 443, 447 (Colo. 1962));
see also U.S. Const. amend. VI; Colo. Const. art.
II, §§ 16, 23. To warrant reversal for cumulative
error, there must have been multiple errors that collectively
prejudiced the substantial rights of the defendant and
affected the integrity of the fact-finding process, even if
any single error didn't. Howard-Walker,
¶¶ 24-25, 443 P.3d at 1011.

¶154
Here, we have either determined or assumed without deciding
that the trial court made several errors, including admitting
Lowry Park evidence as res gestae, evidence of uncharged
threats to Brandi Taylor, evidence related to Sailor's
black eye, a picture of Ray's back tattoo, and irrelevant
hearsay statements MarshallFields made about a dream; and
allowing improper comments by the prosecution. But we also
determined that none of those errors individually warranted
reversal. And now, considering the effect of those errors in
the aggregate, we conclude that they didn't substantially
prejudice Ray or undermine the fairness of his trial.

¶155
Many of the errors involved evidence that was otherwise
admissible or was cumulative of admissible evidence. And in
those few instances where the evidence wasn't admissible
at all, any prejudice was minimized by the brevity of the
presentation, a limiting instruction, and/or further context
and explanation through cross-examination or voir dire.
See Vialpando, ¶ 46, 512 P.3d at 116. Moreover,
none of the errors established proof of an element of any of
the charges, improperly implicated a witness's or
Ray's credibility, or affected Ray's constitutional
rights. See, e.g., Howard-Walker,
¶¶ 40-48, 443 P.3d at 1014-15. The fact that this
was a lengthy trial that included many witnesses and
voluminous evidence also minimized the prejudicial impact
these handful of errors might have had. See
Vialpando, ¶ 33, 512 P.3d at 114;
Howard-Walker, ¶ 40, 443 P.3d at 1014.

¶156
Therefore, we conclude that Ray is not entitled to reversal
under the cumulative error doctrine.

D.
Juror Misconduct

¶157
Following Ray's conviction and sentencing, he moved for a
new trial. In that motion, he alleged that a juror had failed
to disclose material information on her juror questionnaire
that revealed potential bias and prejudice. The information
related to the juror's brother-in-law's recent death,
her family's suspicions that his death was a homicide,
and her belief that potential witnesses in that case
weren't coming forward out of fear. Ray also alleged that
the juror

shared this information with other jurors, which introduced
extraneous prejudicial information into the deliberative
process. He asked the court to hold an evidentiary hearing to
resolve these allegations and to allow him to subpoena jurors
to testify at the hearing. The parties discussed the issue at
a postconviction evidentiary hearing for other matters. The
court concluded that an evidentiary hearing was required to
discuss the juror's failure to disclose information on
her questionnaire because it raised issues of potential bias.
The court further explained that the issue of whether the
juror had introduced extraneous information into the jury
room wouldn't be discussed, but it recognized that the
hearing could "morph" and that the extraneous
information issue could become relevant.

¶158
At the subsequent evidentiary hearing, the juror explained
that her brotherin-law had died of a drug overdose about six
months before Ray's trial, and "[t]he family fe[lt]
like it could have been a homicide," or at least, they
"would like to think" his death wasn't a drug
overdose. She also said that she never saw a police report
and never spoke to the police about her brother-in-law's
death. She conceded it was possible that there were witnesses
who weren't coming forward regarding her
brother-in-law's death, but she didn't have any
information that such witnesses existed. During
cross-examination, she further explained that

although the family had questioned the circumstances of her
brother-in-law's death, the police had never indicated it
was anything other than an overdose.

¶159
At one point during the juror's direct examination,
defense counsel asked if she had told the other jurors about
her brother-in-law's death, and she said,
"Yes." He then asked her to "tell me what you
told the members of the jury," and the prosecution
objected, arguing that the questioning fell under CRE 606 and
invaded "the province of the jury's deliberative
process." The court sustained the objection. After
further discussion, defense counsel asked the juror whether
her brother-inlaw's "suspicious death . . . cause[d]
[her] to have any special insight during [the] deliberations
in [Ray's] case," and she said, "No."
Counsel then again asked the juror whether she shared this
information with the other jurors, and the court again
sustained the prosecutor's objection.

¶160
At the end of the hearing, the court concluded that the juror
hadn't deliberately hidden information in answering the
questionnaire and hadn't, by her conduct, deprived Ray of
the opportunity to challenge her for cause. The court also
concluded that Rule 606 precluded it from inquiring into the
extraneousinformation allegations.

¶161
Ray contends that the court erred by concluding that Rule 606
precluded it from inquiring into the extraneous-information
allegations. We disagree.

¶162
Colorado law strives "to promote finality of verdicts,
shield verdicts from impeachment, and protect jurors from
harassment and coercion" and therefore "strongly
disfavors any juror testimony impeaching a verdict."
Peopl v. Harlan, 109 P.3d 616, 624 (Colo. 2005);
accord Clark v. People, 2024 CO 55, ¶ 66, 553
P.3d 215, 230. As a result, a juror is prohibited from
testifying "as to any matter or statement occurring
during the course of the jury's deliberations or to the
effect of anything upon . . . any . . . juror's mind or
emotions as influencing the juror to assent to or dissent
from the verdict . . . or concerning the juror's mental
processes in connection therewith," though a juror may
testify about "whether extraneous prejudicial
information was improperly brought to the jurors'
attention." CRE 606(b).

¶163
The scope of this no-impeachment rule is broad and allows for
exceptions only when allegations of juror bias are so extreme
that the usual safeguards aren't sufficient to protect
the integrity of the jury-trial right. See
Pena-Rodriguez, 580 U.S. at 221. So, for example,
relying on the nearly identical federal version of this rule,
the Supreme Court has allowed inquiry into the deliberative
process when there was "a showing that one or more
jurors made statements exhibiting overt racial bias that cast
serious doubt on the fairness and impartiality of the
jury's deliberations and resulting verdict."
Id. at 225. To justify setting aside the
noimpeachment bar, the statements "must tend to show
that racial animus was a

significant motivating factor in the juror's vote to
convict." Id. at 225-26. But the Court has
precluded inquiry into juror deliberations even when it was
alleged that a juror was inebriated during deliberations and
when a juror allegedly lied about a pro-defendant bias during
voir dire. See id. at 219-21 (discussing Tanner
v. United States, 483 U.S. 107 (1987), and Warger v.
Shauers, 574 U.S. 40 (2014)).

¶164
A party seeking to impeach a verdict based on the improper
introduction of extraneous prejudicial information to the
jurors "must show both that extraneous information was
improperly before the jury and that the extraneous
information posed the reasonable possibility of prejudice to
the defendant." Clark, ¶ 68, 553 P.3d at
230 (quoting Kendrick v. Pippin, 252 P.3d 1052, 1063
(Colo. 2011), abrogated on other grounds by Bedor v.
Johnson, 2013 CO 4, 292 P.3d 924). So, courts must first
determine whether the complaining party "has presented
competent evidence alleging that extraneous prejudicial
information was improperly before the jury."
Id. at ¶ 70, 553 P.3d at 230. Because this
determination presents a mixed question of law and fact, we
review the court's factual findings for an abuse of
discretion and its legal conclusions de novo.
Kendrick, 252 P.3d at 1064. Whether information
constitutes extraneous prejudicial information is a question
of law. Clark, ¶ 65, 553 P.3d at 230.

¶165
If a court determines the challenged information wasn't
extraneous or prejudicial, it may dismiss a motion for a new
trial without an evidentiary hearing.

Id. at ¶¶ 70, 74, 553 P.3d at 231. But if
the court determines the information was extraneous and
prejudicial, it must then determine whether there was an
objectively "reasonable possibility that the . . .
information influenced the verdict to the detriment of the
defendant." Id. at ¶ 71, 553 P.3d at 231.
This determination is often made after an evidentiary
hearing. Id.; accord Harlan, 109 P.3d at
625.

¶166
Extraneous information is "any information that is not
properly received into evidence or included in the
court's instructions." Kendrick, 252 P.3d
at 1064 (quoting Harlan, 109 P.3d at 624). It
"'consists of (1) "legal content and specific
factual information" (2) "learned from outside the
record" (3) that is "relevant to the issues in a
case."'" Clark, ¶ 75, 553 P.3d at
231 (quoting People v. Newman, 2020 COA 108, ¶
15, 471 P.3d 1243, 1250). Extraneous information is improper
for jury consideration. Kendrick, 252 P.3d at 1064
(explaining that jurors are instructed "to consider only
the evidence admitted at trial and the law as given in the
trial court's instructions" (quoting
Harlan, 109 P.3d at 624)).

¶167
But jurors are expected "to use their life experiences
to engage the record evidence and to participate in
thoughtful deliberations." Id. at 1066
("[T]his approach recognizes the traditional role of the
jury, that the jurors are expected to call on their personal
experiences and common sense in reaching their
verdict."). So, information isn't considered
extraneous "if it was 'part of the juror's
background, gained before the juror was selected to
participate in the case and not

as the result of independent investigation into a matter
relevant to the case.'" People v. Clark,
2015 COA 44, ¶ 222, 370 P.3d 197, 227 (quoting
Kendrick, 252 P.3d at 1066).

¶168
Here, although the juror's family had suspicions about
her brother-in-law's death, there was no evidence of foul
play and no investigation in which the juror was involved or
of which she was aware. And based on the juror's
testimony at the hearing, it seems she was only peripherally
aware of the family's suspicions and not pursuing any
sort of investigation herself. Cf. id. at
¶¶ 239-40, 370 P.3d at 229 (concluding that jurors
introduced extraneous information into deliberations when
they conducted an informal experiment to test the credibility
of witness testimony during the trial). Rather, this
information was part of the juror's background and
personal life experience, independent of the trial. It
wasn't, therefore, extraneous.

¶169
And even if it was, there's no reasonable possibility
that this information could have prejudiced Ray because it
didn't contain any information relevant to the issues in
Ray's case. Moreover, "[b]ecause the line between
past experience and extraneous information is a fine one, the
admonition that we 'err in favor of the lesser of two
evils - protecting the secrecy of jury deliberations at the
expense of possibly allowing irresponsible juror
activity' - is important." Clark, ¶
84, 553 P.3d at 232 (quoting Garcia v. People, 997
P.2d 1, 7 (Colo. 2000)). So, we

conclude that Rule 606(b) precluded jurors from testifying
about the alleged juror misconduct.

E.
Cruel and Unusual Punishment

¶170
Following the guilt phase of Ray's trial, the court held
a separate penaltyphase trial, which resulted in the
imposition of a death sentence. The Governor later commuted
Ray's capital sentence to LWOP. Ray now challenges, for
the first time, his LWOP sentence as unconstitutional, both
facially and as applied, under the Eighth Amendment of the
U.S. Constitution. He asks this court to remand his case so
the district court can hold an evidentiary hearing to address
these constitutional challenges.

¶171
We review constitutional challenges to sentencing
determinations de novo. Lopez v. People, 113 P.3d
713, 720 (Colo. 2005). In doing so, we recognize that it is
the legislature's prerogative to define crimes and
punishments, circumscribed of course by the Eighth
Amendment's prohibition against "cruel and unusual
punishments," and so we generally defer to the
legislature's policy choices regarding sentencing.
McDonald v. People, 2024 CO 75, ¶¶ 8, 10,
560 P.3d 412, 417-18 (quoting U.S. Const. amend. VIII);
accord Colo. Const. art. II, § 20; Ewing v.
California, 538 U.S. 11, 25 (2003) (plurality opinion).
We also generally presume that statutes are constitutional
unless "the party challenging it proves its
unconstitutionality beyond a reasonable doubt." Woo
v. El Paso Cnty. Sheriff's Off.,

2022 CO 56, ¶ 21, 528 P.3d 899, 905 (quoting Coffman
v. Williamson, 2015 CO 35, ¶ 13, 348 P.3d 929,
934).

¶172
"A statute is facially unconstitutional only if no
conceivable set of circumstances exist under which it may be
applied in a constitutionally permissible manner."
People v. Montour, 157 P.3d 489, 499 (Colo. 2007). A
statute is unconstitutional as applied if it doesn't,
"with sufficient clarity, prohibit the conduct against
which it is enforced." People v. Shell, 148
P.3d 162, 173 (Colo. 2006) (quoting People v.
McIntier, 134 P.3d 467, 475 (Colo.App. 2005)).

¶173
The Colorado legislature has created a sentencing scheme that
guides our courts in resentencing defendants who were
initially sentenced to death under Colorado's previous
capital sentencing scheme. Under this revised sentencing
scheme, "the court which previously sentenced a person
to death shall cause such person to be brought before the
court, and the court shall sentence such person to life
imprisonment." § 18-1.3-401(5), C.R.S. (2024). The
statute further explains that, for defendants like Ray, who
committed their offenses between July 1, 1990, and July 1,
2020, life imprisonment means LWOP. §
18-1.3-401(4)(a)(III); see also People v. Tate, 2015
CO 42, ¶¶ 32-34, 352 P.3d 959, 967 (describing
Colorado's evolving definition of "life
imprisonment").

¶174
Ray seems to argue as follows. "[T]he Eighth Amendment
forbids a sentencing scheme that mandates life in prison
without the possibility of parole

for juvenile offenders." Miller v. Alabama, 567
U.S. 460, 479 (2012); see also Graham v. Florida,
560 U.S. 48, 74-75 (2010). Ray was nineteen when he committed
the offenses here. And while nineteen-year-olds aren't
juveniles, they should be included in that statutory
definition because "developing brain science" is
expanding "the longstanding recognition that juveniles
have diminished moral culpability for their crimes . . . to
encompass emerging adults-those who were [eighteen to twenty]
years old at the time of their crimes." Therefore,
Ray's LWOP sentence is facially unconstitutional. We
reject Ray's argument for two reasons.

¶175
First, both the Colorado legislature and the U.S.
Supreme Court recognize eighteen as the age that divides
juveniles and adults, and neither has yet adopted a broader
definition of "juvenile." See Graham, 560
U.S. at 74-75 (noting that "[t]he age of [eighteen] is
the point where society draws the line for many purposes
between childhood and adulthood" (first alteration in
original) (quoting Roper v. Simmons, 543 U.S. 551,
574 (2005))); § 19-1-103(10), (21), (88), C.R.S. (2024)
(defining "Adult" as "a person eighteen years
of age or older"; "Child" as "a person
under eighteen years of age"; and "Juvenile"
as having the same meaning as "Child");
accord § 19-2.5-102(6), (28), C.R.S. (2024).
And, within constitutional limits, we are bound by the
legislature's policy choices.

¶176
Second, Ray's LWOP sentence wasn't imposed
by a court; it was granted by the Governor, exercising his
authority to commute Ray's death sentence. The

Governor has exclusive authority "to grant reprieves,
commutations and pardons after conviction." Colo. Const.
art. IV, § 7. Thus, so long as the Governor's
"commutation is constitutionally permissible" and
the original sentence was "legally imposed by a
court," the judiciary has no authority to alter the
sentence. Johnson v. Perko, 692 P.2d 1140, 1142
(Colo.App. 1984); accord People ex rel. Dunbar v. Dist.
Ct., 502 P.2d 420, 421 (Colo. 1972); People v.
Davis, 526 P.2d 312, 313 (Colo. 1974). Ray's LWOP
sentence meets both criteria.

¶177
Ray was originally sentenced pursuant to the capital
sentencing procedures in place at the time of his conviction,
and he hasn't argued on appeal that his original capital
sentence wasn't legally imposed. Moreover, under the
sentencing statutes, a court could have resentenced Ray to
LWOP following the death penalty's abolishment, and we
have previously held that mandatory LWOP sentences for adult
class 1 felony offenders aren't categorically
unconstitutional. Sellers v. People, 2024 CO 64,
¶ 37, 560 P.3d 954, 962.[9]

¶178
We thus conclude that it is facially constitutional for the
Governor to commute a defendant's capital sentence to
LWOP when the defendant was at least nineteen years old when
he committed the relevant offenses.

¶179
We also conclude that Ray's sentence is constitutional as
applied to him because we assume that in commuting Ray's
sentence, the Governor adhered to the statutory requirements
and considered Ray's conduct during incarceration and his
reformation potential. See § 16-17-102(1),
C.R.S. (2024). And while we commend Ray for refocusing his
life in a positive direction, we determine constitutionality
at the time a sentence is imposed. See, e.g.,
Lucero v. People, 2017 CO 49, ¶¶ 26-29,
394 P.3d 1128, 1134 (concluding that the defendant's
sentence was constitutional and "appropriate"
because the sentencing court considered the relevant
circumstances at the time the sentence was imposed).
Therefore, we need not remand this case to the trial court
for an evidentiary hearing regarding these claims.

III.
Conclusion

¶180
We affirm the trial court's judgment of conviction and
Ray's LWOP sentence.

---------

[1] Ray was also charged with two counts
of second degree murder, naming Marshall-Fields and Wolfe as
victims; one count of conspiracy to commit murder; three
counts of solicitation to commit murder; two counts of
aggravated intimidation of a witness and two counts of
retaliation against a witness, naming Marshall-Fields and
Wolfe as victims; three counts of intimidating a witness,
naming Marshall-Fields, Teresa Riley, and LaToya Sailor Ray
as victims; one count of unlawful distribution of a
controlled substance; one count of bribing a witness, naming
Marshall-Fields as the victim; one count of violating bail
bond conditions; one count of violating a restraining order;
and two crime-of-violence sentence enhancers.

[2] Many of the pretrial motions,
hearings, and orders addressed Owens, Ray, and Carter at the
same time. However, because Owens's trial was scheduled
to go first, the court often addressed the issues as to Owens
and then later either adopted or incorporated those rulings
as to the other defendants.

[3] It is the parties' duty to
identify where in the record the ruling or order they seek to
have us review is located. C.A.R. 28(a)(7). But the parties
failed to identify where the trial court provided its reason
for admitting the evidence containing the threats against
Taylor, and although we aren't required to scour the
record for such information, we have looked and haven't
found a clear ruling. So, we will review the court's
admission of these threats as if they were admitted under the
res gestae doctrine. See People v. Notyce, 2014 COA
52, ¶ 4, 328 P.3d 302, 303.

[4] The tattoo references a lyric from the
song, "Crime Pays" by Cam'ron: "Crime pays
99 ways, 9 gauge, AK-47 homey hit the highway."
Cam'ron, Crime Pays, on Crime Pays
(Diplomat Records 2009).

[5] Even if these statements weren't
excited utterances, they were admissible under the residual
hearsay rule. First, the statements were relevant to
a material fact. Ray was charged with intimidating a witness,
which required the prosecution to prove that Ray used "a
threat, act of harassment . . ., or act of harm or
injury" against a witness in a criminal proceeding.
§ 18 8 704(1)(a), C.R.S. (2024). So,
Marshall-Fields's statements to his friends that he was
threatened in Gibby's were relevant to show that Ray
(through Carter) committed that offense. Second, had
Marshall-Fields not been killed, he could have testified to
these facts directly since he was the person to whom the
threats were made. But because Marshall-Fields was
unavailable to testify, his friends' testimony about what
he told them was more probative of this fact than any other
evidence that could reasonably have been obtained. See
Pena, 173 P.3d at 1112. Third, the general
purposes of the rules of evidence and the interests of
justice were served by admission of these statements. See
id.; see also CRE 803(2)-(3), 804, 807;
Vasquez, 173 P.3d at 1104 ("The forfeiture
doctrine prevents defendants from profiting by their own
misconduct ...."). The parties discussed the
admissibility of Marshall-Fields's statements under the
residual hearsay rule at a pretrial hearing nearly nine
months before trial, providing Ray with ample notice that the
statements would be offered into evidence at trial and an
opportunity to object before the evidence was presented to
the jury. See Pena, 173 P.3d at 1112. And, as
discussed above, Marshall-Fields made these statements under
conditions that provided circumstantial guarantees of
trustworthiness. See id.; Compan, 121 P.3d
at 882.

[6] For this same reason, the statements
weren't admissible under the residual hearsay exception.
See CRE 807 (admissibility requires the court to
find that the statement is relevant to a material
fact).

[7] We also conclude that, for the same
reasons the statements Marshall-Fields made to his friends
about the incident at Gibby's were admissible under the
residual hearsay rule, these statements were admissible under
the residual hearsay rule as well.

[8] The prosecutor used the actual racial
slur during trial, which we won't repeat here. We use
"N-word" in this opinion instead to minimize the
harm such language may cause.

[9] Even if nineteen-year-olds were
juveniles for sentencing purposes, the Supreme Court in
Miller held only that mandatory LWOP
sentences for juveniles are unconstitutional. 567 U.S. at
479-80; see also, e.g., Graham, 560 U.S. at 74-75.
But there was nothing mandatory about Ray's LWOP
sentence. The Governor is authorized to commute a capital
sentence "by reducing the penalty . . . to imprisonment
for life or for a term of not less than twenty years at hard
labor." § 16-17-101, C.R.S. (2024). Thus, the
Governor wasn't required to reduce Ray's sentence to
LWOP; he had other options. But he chose LWOP after,
presumably, considering the circumstances of this particular
case as required by statute-including, Ray's character
before conviction and during confinement, any
"statements of the sentencing judge and the district
attorneys . . . and any other material [or comments]
concerning the merits of the [commutation] application"
that the Governor believed to be "just and proper,"
"with due regard for the reformation of the
accused." § 16-17-102(1), C.R.S. (2024).

---------